In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1331

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAFIK M. HANNA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 00406—**David H. Coar**, *Judge.*

ARGUED SEPTEMBER 9, 2010—DECIDED DECEMBER 22, 2010

Before WOOD, EVANS, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* In the wake of his divorce, Dr. Rafik Hanna was ordered by an Illinois court to make child-support payments to his daughter. For the most part, he flouted this order. After several years of nonpayment and a move to Washington State, a federal grand jury in Chicago indicted Hanna on charges that he willfully failed to pay a support obligation to a child residing in another state, in violation of the Deadbeat

Parents Punishment Act of 1998, 18 U.S.C. § 228 ("Section 228"). A jury convicted Hanna, and the district court sentenced him to two years' imprisonment and a year of supervised release; the court also ordered him to pay $247,843.99 in restitution. In this appeal, Hanna primarily attacks the sufficiency of the evidence on two points—his income and willfulness. Hanna adds that the district court should have instructed the jury on the U.S. Tax Code, that it abused its discretion by admitting unfairly prejudicial evidence, and that it erred by failing to alter the restitution order to reflect a support payment that he made after he was convicted. We conclude that the district court committed no reversible error and thus affirm the judgment.

**I**

When his daughter was born in 1996, Hanna was earning roughly $180,000 annually as a pathologist in Illinois. Shortly after her birth, Hanna and his wife sought a divorce, which was finalized in March 1999. In September 2001, an Illinois court ordered Hanna to make biweekly child-support payments of $967.38 through August 2014. At times, the court enforced its order by garnishing Hanna's wages. Hanna asserts that in 2002 he began having trouble finding steady employment. Around that time, he stopped working as a pathologist and left Illinois for the Pacific Northwest.

Hanna landed in Vancouver, Washington, a border-town suburb of Portland, Oregon. There, for a brief time, he maintained a checking account at Bank of America. But then the Washington State Division of Child Support

sent him a number of notices informing him that he owed over $38,000 in back child-support payments. He elected not to respond to those notices, and so in December 2003, the Washington authorities attached the entire balance (just over $4,000) then in the account. Rather than replenishing it and thus making more money available to the state, Hanna closed it. A year later, after additional requests for payment, the state suspended Hanna's license to practice medicine in Washington.

In the meantime, Hanna was living quite well. Hanna took out a lease for a Lexus ES 300 in October 2002, and paid nearly $800 a month for the car through September 2005. In December 2003, just three months after losing his Washington medical license, he leased a Porsche Boxster S, putting $1,455 down and agreeing to pay $930 a month for five years. On the lease application, Hanna listed an annual income between $100,000 and $150,000. In August 2005 Hanna leased a third car (a Jaguar) for almost $950 per month, and in March 2008 Hanna took out a fourth lease of $1,100 a month for an Audi A6. All the while, Hanna spent significant sums on travel, gifts, and entertainment. He vacationed at spa resorts on Catalina Island in California, on Victoria Island in British Columbia, and at Sunriver in Oregon; he played golf at championship courses; he frequented the symphony and professional basketball games; he funded expensive shopping excursions for a new girlfriend at high-end clothiers such as Bebe and Nordstrom; and he even took a trip to Walt Disney World.

To support this lifestyle, Hanna maintained two accounts in Canada at the Bank of Nova Scotia. Between April 2005 and April 2009, those accounts took in over $500,000, a significant portion of which came from members of Hanna's family. Hanna explained that his family had supported him during this period because he had no income and was unable to secure "any form of substantial employment"—a condition explained in large part by the fact that other states followed Washington's lead and revoked the remainder of his medical licenses. Hanna's ability to spend freely, he maintains, was further limited by the gifts themselves because they came with "strings attached." The donors, according to Hanna, insisted that he use the funds only to cover his own support and his credit card payments; apparently they did not want him to keep current with his child-support obligations.

In May 2005, two weeks after his indictment, Hanna was arrested. Shortly thereafter, Special Agent Robin Bonn of the U.S. Department of Health and Human Services interviewed Hanna, who admitted that he had not met his child-support obligations even after receiving past-due notices and warnings about the possible suspension of his medial licenses. When asked why he had not paid, Hanna replied defiantly, "I am not going to use my life lines to pay child support. I'm using them to pay myself." At trial, Bonn testified about the interview. During closing arguments the government displayed Hanna's statement beneath side-by-side photographs of his daughter and a Porsche Boxster S. Hanna objected to the exhibit, but the district judge

overruled the objection. In his closing argument, Hanna's lawyer referred to the U.S. Tax Code (alluding to Hanna's theory that "income" for purposes of child-support obligations is identical to "income" for purposes of federal taxes); the lawyer later tried unsuccessfully to persuade the district court to instruct the jury on tax law. The jury convicted, and the court then ordered the usual pre-sentence investigation. Just a week before his sentencing hearing, Hanna suddenly paid $167,000 toward his child-support arrearage. As part of the sentence, the court ordered Hanna to pay $247,843.99 as restitution—the amount he owed in back support payment as of the day of his conviction, without in so many words taking into account the $167,000 payment. This appeal followed.

## II

### A

Hanna first presents two arguments based on the sufficiency of the evidence to support his conviction. Both derive from his assertion that between 2005 and 2009 he lived almost exclusively on gifts from family members. To succeed, Hanna must convince us that even when viewing the evidence in the light most favorable to the verdict, no rational jury could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Smith*, 576 F.3d 681, 686 (7th Cir. 2009). Neither of Hanna's arguments comes close to meeting that standard.

First, Hanna asserts that there was insufficient evidence of his "income" to sustain his conviction. In his view, gifts do "not constitute income under the child support order" because they receive special treatment under the Internal Revenue Code; it thus follows, he asserts, that he could not have violated Section 228. Punishment under Section 228, however, has nothing to do with a defendant's income for tax purposes, and the word "income" is nowhere to be found in the statute. Section 228 punishes any person who "willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000." 18 U.S.C. § 228(a)(3). State law determines which financial resources may be considered in setting a "support obligation" under the statute; we do not have before us the question whether the state court properly applied its own law in setting a support obligation, nor would that be within our jurisdiction in any event. See *id.* § 228(f)(3); *United States v. Kramer*, 225 F.3d 847, 851 (7th Cir. 2000).

Though Hanna seems to concede the latter point, his argument apparently rests on the fact that Illinois courts look at a noncustodial parent's "net income" when computing the amount of child support due. See 750 ILCS 5/505(a)(3) ("Section 505"). Though largely beside the point, Hanna's argument misunderstands Illinois law. Gifts from family members are part of a parent's "net income" under Section 505 and are properly included when an Illinois court tabulates how much to require from a parent when ordering child support. See *In re*

*Marriage of Rogers*, 820 N.E. 2d 386, 390-91 (Ill. 2004). Bequests are also normally income for purposes of child support, even though they receive special treatment under the Internal Revenue Code.

Hanna's second argument focuses on whether there was enough evidence to permit the jury to find that his conduct was "willful." He takes the position that, because his gifts came with "strings attached" and he was "obligated to follow the wishes of the giftors and utilize the funds to pay himself" rather than paying his child support, there is no evidence that he willfully avoided paying his support obligation. Frankly, this strikes us as frivolous. First, there is no reason why the jury was obliged to credit this explanation, nor is there any reason to think that Illinois would enforce this kind of private expectation. We have joined other circuits in holding that the willfulness element under Section 228 is satisfied by proof that the defendant intentionally violated a known legal duty to pay child support. See *United States v. Bell*, 598 F.3d 366, 370-71 (7th Cir. 2010) (collecting cases); *Kramer*, 225 F.3d at 857. The necessary failure to pay can be shown either by a refusal to pay money already in the defendant's possession or by proof that the defendant consciously avoided having sufficient resources—for example, by refusing to work—to pay a support order. See *United States v. Edelkind*, 525 F.3d 388, 399 (5th Cir. 2008).

A true inability to pay is a different matter; that might negate the element of willfulness under Section 228. As the Second Circuit has explained, a "defendant's inability

to pay any amount past due . . . provides a defense to liability under the Act, and the defendant is free to present evidence that during the period charged in the indictment, his income was not sufficient, after meeting his basic subsistence needs, to enable him to pay any portion of the support obligation." *United States v. Mattice*, 186 F.3d 219, 228-29 (2d Cir. 1999); *cf. Bell*, 598 F.3d at 371 (approving jury instruction patterned on *Mattice*).

But this is a functional test that does not depend on the restricted concept of "income" that Hanna has pressed. Hanna reads *Mattice* and our decision in *United States v. Black*, 125 F.3d 454 (7th Cir. 1997), as standing for the proposition that "income" includes only those funds treated as income by the Internal Revenue Service for tax purposes. (The definition of gross income is capacious, see 26 U.S.C. § 61, but it is true that gifts are taxed under a separate regime, see 26 U.S.C. §§ 2501 *et seq.*) On the basis of that understanding, Hanna argues that the large cash gifts he received from his family were not part of his "income," and therefore those funds could not be considered when determining whether he had the ability to pay what he owed to support his daughter. The Illinois statute, however, adopts no such link between funds to which the state may look for support and income that may be subject to federal tax. While *Mattice* and *Black* mention the word "income" and examined federal tax returns, neither opinion suggests that a jury is permitted to consider only a defendant's federally taxable "income" when determining that defendant's ability to pay. To the con-

trary, the states can and do assert the right to look at the defendant's resources more broadly. See, *e.g.*, BLACK'S LAW DICTIONARY 778 (Brian A. Garner ed., 8th ed. 2004) (defining income as "money or other form of payment that one receives" from, among other things, "gifts . . . and the like"); BORIS I. BITTKER & LAWRENCE LOKKEN, I FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS 5-1 (3d ed. 1999) (describing how federal tax "income" differs from broader notions of "income"); HENRY C. SIMONS, PERSONAL INCOME TAXATION 50 (1938) (proposing the "Haig-Simons" definition of "income," which is the "algebraic sum" of the market value of one's consumption and the "change in the value of the store of property rights" during the relevant period of time); Richard Schmalbeck, *Gifts and the Income Tax—An Enduring Puzzle*, 73 LAW & CONTEMP. PROBS. 63, 63-65 (2010) (describing gifts as income under the widely-accepted Haig-Simons conception of income). Nothing in federal law prevents states from considering cash gifts when they enforce a support obligation. Indeed, we do much the same thing when we determine whether a party may proceed *in forma pauperis* in this court; for that purpose, we look at all resources, including gifts. See Affidavit Accompanying Motion for Permission to Appeal In Forma Pauperis, FED. R. APP. P. Form 4.

Hanna's proposed limitation ignores the fact that determining whether a person has the "ability to pay" for something is much different than asking whether she has taxable income. *Cf.* WILLIAM A. KLEIN ET AL., FEDERAL INCOME TAXATION 6-8 (14th ed. 2006) (distinguishing ability to pay and income). While the presence of "income"

in the sense the term is used in the tax laws is relevant to the ability to pay a debt, the converse of that statement is not true. A person's non-taxable assets may be used to satisfy a debt. *Mattice* and later cases recognized this when they held that a defendant's ability to meet his "basic subsistence needs," not the defendant's income, is what matters for purposes of the prosecutor's effort to prove willfulness. See, *e.g.*, *United States v. Kukafka*, 478 F.3d 531, 539 (3d Cir. 2007). A jury might find proof of willfulness lacking if the evidence showed that the defendant had no ability to pay even a part of the support debt.

In summary, for purposes of assessing the defendant's ability to pay in a prosecution under Section 228, a jury is entitled to look beyond the narrow concept of "income" used in the tax laws and to consider all of the resources available to a defendant, regardless of their source. If the evidence shows, as it did here, that the defendant received thousands of dollars in gifts from family, yet refused to use any of those funds to pay a support obligation, it is more than enough to support the "willfulness" element of the statute.

Other circuits have come to conclusions consistent with ours. See, *e.g.*, *Edelkind*, 525 F.3d at 398-99 (approving a jury instruction that defined willfulness in terms of whether the defendant "had money which he used to pay other expenses beyond living expenses instead of paying his child support"); *United States v. Smith*, 278 F.3d 33, 36-37 (1st Cir. 2002) (approving of jury instruction requiring government to prove that a defendant

"had sufficient funds" to show willfulness); *United States v. Ballek*, 170 F.3d 871, 873 (9th Cir. 1999) (explaining that willful can mean "having the money and refusing to use it for child support; or, not having the money because one has failed to avail oneself of the available means of obtaining it"); *cf. Kukafka*, 478 F.3d at 539 (approving ability to pay instruction that referred only to a defendant's "ability to pay" without any reference to income). See also H.R. Rep. 102-771, at 6 (1992) (discussing the Child Support Recovery Act of 1992, a precursor to the Deadbeat Parents Punishment Act of 1998, and using the term "sufficient funds" rather than the narrower phrase "taxable income").

Stripped of his technical argument about his ability to pay, Hanna cannot prevail on his second challenge to the evidence. Between 2005 and 2009 Hanna had over $500,000 deposited into his Canadian bank accounts, leased several luxury cars, went on expensive vacations, and lived a life well beyond his "basic subsistence needs." Nor does the record bear out Hanna's contention that this money came with "strings attached." In fact, Hanna spent liberally on other people, such as his new girlfriend, whom he treated to luxurious shopping sprees and vacations. The jury was entitled to infer that by closing his U.S. bank accounts and replacing them with Canadian accounts that (he assumed) were beyond the reach of compelled garnishment, Hanna attempted affirmatively to evade enforcement of his obligation. And, even though his medical licenses were suspended and he could not work as a pathologist, he remained someone with a high level of skill, education, and training.

The jury could have inferred that he consciously chose not to work elsewhere in any field where those skills might have been exploited.

B

Hanna next argues that the district court made a number of errors during trial and sentencing. We address these issues briefly. First, although he did not offer any jury instructions, Hanna argues that district court should have instructed the jury on the provision of U.S. Tax Code that excludes gifts from "gross income" for tax purposes, see 26 U.S.C. § 102(a), because his lawyer talked about it during his closing argument. The argument, however, has been forfeited. See FED. R. CRIM. P. 30(d). Hanna has no hope of showing plain error, because, as we have already explained, the court's decision not to address this matter was correct.

Second, Hanna accuses the district court of abusing its discretion during closing arguments by admitting an exhibit from the government that displayed side-by-side pictures of his daughter and a Porsche Boxster just above his statement to Agent Bonn—"I am not going to use my life lines to pay child support. I'm using them to pay myself." This combination of materials, Hanna asserts, inflamed the jury and was therefore unfairly prejudicial. See FED. R. EVID. 403. Because "most relevant evidence is, by its very nature, prejudicial," we have emphasized that evidence must be *unfairly* prejudicial to require exclusion. *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003).

Hanna has not demonstrated that he was unfairly prejudiced, let alone that the district court abused its discretion by admitting the exhibit. He does not deny making the statement. All he says is that the exhibit inflamed the jury by suggesting that he placed a higher value on his Porsche than his daughter. The government stands by its exhibit and the message it conveyed: that Hanna did, in fact, place a higher premium on his cars and lifestyle than his own daughter. In our view, the district court was entitled to come to the conclusion that the exhibit, while hard-hitting, was a permissible use of the evidence in the case. It illustrated graphically Hanna's willfulness and the choice he made to live a life of luxury while at the same time ignoring his obligation to pay child support. Where, as here, a defendant is "being prosecuted for exactly what [the evidence] depicts," *United States v. Burt*, 495 F.3d 733, 741 (7th Cir. 2007), we have consistently rejected Rule 403 challenges. See, *e.g.*, *United States v. Zawanda*, 552 F.3d 531, 535 (7th Cir. 2008).

Finally, Hanna argues that the district court erred by setting the restitution order at $247,843.99. Several months after his conviction, but just a week before his sentencing hearing, Hanna made a $167,000 payment, which is not reflected in this figure. Hanna argues that, based upon Section 228, the district court should have reduced the amount of restitution to reflect his payment. (In fact, Hanna failed to raise this objection before the district court, and so he should be arguing plain error; the government failed to notice this, however, and so we will use the more lenient standard.) Section 228 re-

quires the district court to order restitution "as it exists at the time of sentencing," 18 U.S.C. § 228(d), which Hanna interprets as requiring the district court to take account of his eleventh-hour payment. We can assume, as Hanna does, that it would be wrong for the district court to ignore his payment and require him to pay a larger figure. But that is not what the court did. Instead, consistent with 18 U.S.C. § 3663A (the Mandatory Victim Restitution Act), the district court ordered $247,843.99 restitution "less any amount paid toward [the] arrears." The latter phrase assures that Hanna's payment will be credited properly to the satisfaction of the total debt. Simple subtraction shows that as of the time of sentencing, the amount that Hanna still owed was $247,843.99 - $167,000, or $80,843.99. The larger figure came from Hanna's Presentence Investigation Report, which was prepared before he made his last-minute payment. The district court's formula was a satisfactory way of handling not only this adjustment, but any others.

The judgment of the district court is AFFIRMED.