In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1405

GREGORY SMITH,

*Plaintiff-Appellant,*

*v.*

CHICAGO POLICE OFFICERS JALANCE HUNT,
JOSE CORTES, JOSEPH MARTIS, PATRICK BOYLE,
DANIEL BINFA, DANIELLE N. PHILP,
WILLIAM R. WHELEHAN, AND
SERGEANT RICHARD DOWLING,

*Defendant-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08-cv-6982—**Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 19, 2012—DECIDED FEBRUARY 14, 2013

Before BAUER, KANNE, and WOOD, *Circuit Judges*.

KANNE, *Circuit Judge*. Following the dislocation and eventual amputation of his finger, Gregory Smith filed suit against a group of Chicago police officers. Smith alleged that their excessive force and failure to provide

medical attention during two separate arrests led to his amputation. During trial, the district court allowed the defense to present evidence of Smith's heroin use prior to one of the arrests. After the jury found for the defendants, Smith brought this appeal, in which he argues that the admission of that evidence and the references made to it during the defense's closing argument denied him a fair trial. Finding that the admission of the evidence did not constitute an abuse of the district court's discretion and that the improper statement did not affect the outcome of the trial, we affirm.

## I. BACKGROUND

### A. The Arrests and Injury

On December 7, 2007, Gregory Smith was arrested by Chicago Police Officers JaLance Hunt and Jose Cortes with narcotics on his person. Smith alleges that, during the arrest, the officers stomped on his hand several times and beat him in various other ways. The officers deny such behavior. Although the actions of the parties during the arrest are disputed, by the time Smith arrived at the police station around 12:05 a.m. on December 8, he had an obvious finger injury. Said a sergeant who saw the finger: "one of his fingers wasn't in line with the rest of the fingers on his hand." (R. 132 at 67.) Soon thereafter, officers delivered Smith to Holy Cross Hospital, where a triage nurse diagnosed him with a dislocated finger.

Dr. Danielle Wallace examined Smith at around 2:15 a.m. This interaction became important to Smith's

lawsuit against the officers and, later, this appeal. Dr. Wallace determined that Smith's finger needed to be moved back into place but also that some sort of pain-killer should be administered during the potentially unpleasant procedure. Dr. Wallace testified that she first recommended a "digital block"—a local anesthetic that would numb Smith's finger and the area around it. According to Dr. Wallace's testimony, however, Smith declined the anesthetic and instead requested "Dilaudid" (a morphine derivative similar in chemical composition to heroin). Smith denied requesting any specific medication or even knowing what painkiller he received. Dr. Wallace first administered morphine, and when that failed to reduce the pain sufficiently, proceeded to administer Dilaudid. She then re-set, splinted, and bandaged Smith's finger.

Smith returned to the hospital on December 22 for a follow-up appointment. By that point, his finger was swollen and infected. In fact, the finger was no longer medically alive. The treating physician told Smith that amputation might be necessary and scheduled another appointment for December 29.

On December 28, before Smith could return for that appointment, he was again arrested by Officer Cortes. Smith again alleges mistreatment during this arrest—specifically officers kneeling on and slapping his injured hand—which the officers again deny. At the time of Smith's arrest, officers found Smith sitting on a sofa in his home with drugs splayed out in front of him. It was apparent that the condition of his finger had worsened:

the bandage was emitting a strong odor and oozing. After processing Smith at the police station, officers once again brought him to Holy Cross Hospital, where a doctor determined that the finger required amputation. The dislocation and subsequent amputation—a result, Smith says, of the officers' behavior during his arrests—formed the basis of Smith's lawsuit against the defendants.

## B. Legal Proceedings

Smith's amended complaint alleged excessive force, battery, failure to intervene, and failure to provide medical attention. During a pre-trial deposition, Smith admitted to using heroin five or six hours before the December 7 arrest. Smith subsequently filed a motion *in limine* to suppress this evidence at trial. The trial court initially rejected Smith's motion. The court found that the heroin use could be relevant to Smith's behavior during the arrest and to whether he complained about the pain of his injury to the officers. Prior to trial, however, the court reversed itself; evidence of Smith's heroin use on December 7 would no longer be allowed. In its ruling, the court found that evidence of Smith's heroin use would invite speculation by jurors, who would not "know what the effect of heroin would be on an individual under those circumstances." (R. 124 at 35.)

In the midst of trial, however, the court reversed itself yet again. The precipitating events were Dr. Wallace's testimony, in which she described Smith specifically requesting Dilaudid, and Smith's testimony

denying that he made such a request. The court found that Smith had created a dispute to which evidence of his heroin use was relevant: whether and why he requested a certain pain reliever. In other words, Smith, the court said, had "opened the door" for evidence of his heroin use to come in. The defense could introduce evidence of heroin use to suggest that Smith had a motive other than pain for requesting Dilaudid, which is chemically similar to heroin. At the same time, the court purported to limit potential use of the testimony. Evidence of Smith's heroin use, the court said, was only relevant to the calculation of damages: how much pain did Smith need to be compensated for? (R. 130 at 40.) ("That goes to damages now, not to his ability to recall, not to his behavior during the arrest. It goes to damages."). Following this ruling, the defendants elicited testimony from Smith, in front of the jury, regarding his heroin use on December 7.

The court's ruling, however, did not affect the admission of other drug-related testimony. Indeed, the jury heard substantial evidence of Smith's involvement with drugs generally and narcotics specifically. It heard that he had been convicted of a narcotics-related offense in 2006. (R. 130 at 10.) It heard that he was arrested with narcotics on his person on December 7. (R. 128 at 48, 61.) It heard that the officers were at Smith's house on December 28 pursuant to complaints of narcotics sales. (R. 125 at 82; R. 126 at 13.) It heard that on December 28, the officers found Smith surrounded by drugs. (R. 125 at 85-86; R. 126 at 21.)

During the trial, the jury heard from several of the police officers; Smith's mother and uncle; Dr. Wallace; Dr. Michael Vender, a defense expert who examined Smith's medical records and deposition testimony; several of Smith's neighbors, including potential eyewitnesses; and, Smith himself. Smith's attorneys cross-examined Dr. Wallace in great depth on her medical decisions and whether the various treatments she prescribed were medically necessary (they were, she said) and presented a consistent story of abuse at the hands of the officers. They also elicited testimony from Smith's neighbors, who generally corroborated Smith's version of events. In response, the defense thoroughly questioned the neighbors about their prior interactions with Smith in order to cast doubt on their stories, and presented testimony from Dr. Vender, who said that Smith's injuries could not have occurred in the manner he described. The defense also presented evidence through Dr. Wallace to establish that the length of time Smith waited for medical treatment was not unreasonable and therefore could not justify Smith's claims for failure to provide medical attention.

Despite the court's instruction to limit discussion of the December 7 heroin use to the issue of damages, defense counsel argued the following during closing:

> "Why—why didn't he complain? The officers can't say—can't get in his head and say well, this is why he didn't complain earlier. Is it because his fingers were frozen because he was standing outside for hours in the freezing cold? Is it because he took heroin earlier that day?"

(R. 132 at 145.) Smith immediately objected to this state-ment, and the court sustained the objection. At the close of the case, the court instructed the jurors that closing arguments are not evidence and that they should base their verdict on their recollections of the evidence. The court offered to issue a further curative instruction aimed at limiting consideration of the heroin use testi-mony, but Smith declined this offer.

After the jury returned a verdict for the defendants, Smith timely filed this appeal. He alleges that the trial court abused its discretion in admitting the evidence and that the improper statements made during closing argument merit a new trial. In so doing, Smith argues that (1) the evidence was irrelevant to his case; (2) even if relevant, the evidence was overly prejudicial and should have been excluded; (3) introducing evidence of his heroin use constituted an improper character attack; and, (4) defense counsel made an improper closing argu-ment referencing the evidence of heroin use. We address each of these arguments below.

## II. ANALYSIS

### A. Admission of the Evidence

This court reviews claims that evidence has been im-properly admitted for an abuse of discretion. *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012). A decision is an abuse of discretion only if "no reasonable person would agree with the decision made by the trial court." *United States v. Thomas*, 453 F.3d

838, 845 (7th Cir. 2006). But an abuse of discretion alone is not enough to warrant granting a new trial. *Mgmt. Hospitality of Racine*, 666 F.3d at 440. Rather, we will disrupt a trial court's decision only if the abuse violated a party's substantial rights. *Florek v. Vill. of Mundelein*, 649 F.3d 594, 602 (7th Cir. 2011). To meet that threshold, a significant chance must exist that the ruling affected the outcome of the trial. *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000). We do not find convincing any of Smith's arguments that the trial court abused its discretion by admitting evidence of the December 7 heroin use. Even if it had, we do not find that the admission affected the outcome of the trial such that it violated Smith's substantial rights.

### 1.  *Admission was not an abuse of discretion*

#### a.  *Relevance*

Smith's first two arguments can be collapsed into one discussion of relevance; he argues that the testimony was not relevant to his legal claims or was at least irrelevant absent expert testimony on heroin's effects on a user (which the defense did not provide).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The amount of pain Smith experienced on December 7 and 8 was clearly "of consequence" to the proceedings—Smith sought damages for pain and suffering, and his attorneys ar-

gued throughout the trial that Smith's award should be significant because of the high level of pain that his client endured. (R. 132 at 135) ([Mr. Neslund, Smith's counsel, during closing argument] "When you think of the pain and suffering, think about three things back there. How bad was it? How much did it hurt? Where on the scale of intensity this pain was? How long did it last? Where on the scale of time was he left in pain?"). Therefore, evidence that might make a specific level of pain more or less probable is relevant to the proceeding. We do not think that the trial court abused its discretion by determining that evidence of Smith's heroin use could be so-described.

Furthermore, the level of pain Smith experienced during the evening of December 7 and morning of December 8 was very much under dispute. Smith contends that his "pain level of 10 out of 10 at the ER was not at issue in this case." (Appellant's Br. at 13.) Although Smith's characterization of the record may be true in a sense, it is also incomplete. No party disputes that Smith *described* his pain as "10 out of 10" in the emergency room. Smith's description alone, however, did not conclusively determine the level of pain that he experienced (and could be compensated for). Indeed, Smith's own attorneys did not rely on Smith's description alone and repeatedly used third party descriptions of Smith and his injury to illustrate vividly the extent of Smith's pain and suffering. (R. 127 at 34-35) ("[Mr. Neslund] Q. Now, a complete dislocation such as we see in this X-ray, would you agree that that is a painful injury? [Dr. Vender] A. Yes . . . . Q. And, Doctor, is there severe pain

with range of motion of the finger when you have this kind of injury?"); (R. 132 at 51) ([Mr. Neslund, reading stipulated evidence]: "A visual check of Gregory Smith was performed and it was determined that Mr. Smith was in obvious pain or had an obvious injury."); (*id.* at 77) ("[Mr. Robertson] Q. Now, when you saw Greg Smith at the station, he had a visible dislocation of a finger, correct? [Officer Boyle] A. When I looked at him yes . . . it appeared as if his finger were bent up."). Smith's attorneys also tried to rely on the nature and dosage of the painkillers that Smith received at the emergency room to establish the level of pain that Smith deserved compensation for. (R. 127 at 40) ("[Mr. Neslund] Q. And that was to treat the pain he was experiencing once he arrived; is that correct? [Dr. Vender] A. Well, morphine is for pain . . . . Q. Right now, am I correct that that [Dilaudid] is a pain medication administered in emergency rooms that is stronger than morphine? A. It's not necessarily stronger. It's just—it's different. Q. It's not eight times stronger than morphine, Doctor?"); (*id.* at 42) ([Mr. Neslund] Q. Dr. Vender, given the degree of pain as documented in the emergency room records, the pain medications administered to Mr. Smith, and the X-ray you reviewed, is it fair to say that Mr. Smith suffered a severely painful injury the night of December 7th? A. It would appear so.") Given this testimony, the defendants could permissibly offer an alternative explanation for the events of that night, one that would illustrate a lower level of pain and justify a lower level of damages. Particularly, they could argue that the nature and dosage of the pain medications prescribed

for Smith—medications that the defense argued Smith himself requested—could be explained by factors other than pain, such as a desire to ingest opiates generally. We think that a reasonable person might find that Smith's admitted heroin use earlier in the day could be relevant to that explanation.

Smith focuses his relevance argument on whether the evidence of his heroin use had any tendency to make his excessive force claims more or less probable. We find this argument misplaced. The trial court admitted the evidence for the sole purpose of determining damages for pain and suffering. Evidence, however, does not need to be relevant to each and every claim to qualify as "relevant" for purposes of admissibility. Here, evidence of Smith's heroin use was relevant to the events at the hospital and how they related to his level of pain and suffering. That was enough for the court to admit the testimony.

Smith's contention that this evidence was irrelevant without expert testimony of heroin's effect is similarly misplaced, as Smith appears to misapprehend the reason the trial court admitted the evidence. Smith contends that "[t]he effect of heroin, if any on Smith's ability to feel and articulate pain during the time frame from his arrest through his treatment, was clearly a topic that was beyond the knowledge of an average juror." (Appellant's Br. at 14.) However true that statement may be, Smith's "ability to feel and articulate pain" was not what was at issue for the admission of this evidence—his motivation for allegedly requesting

a specific painkiller by name was. We think it is within the ken of the average juror to appreciate the basic relationship between two opiates (in this case, heroin and Dilaudid), and to reasonably conclude that a desire for one might be related to a desire for the other. Although expert testimony on the effects of either heroin or Dilaudid might have been useful, it was not an abuse of discretion for the trial court to admit evidence of Smith's heroin use without such testimony.

### b. Unfair prejudice

Smith next argues that even if the evidence were relevant, its admission was overly prejudicial and should have been excluded under Fed. R. Evid. 403. We are unconvinced. Evidence should be excluded under Fed. R. Evid. 403 "'if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Cobige v. City of Chicago*, 651 F.3d 780, 784 (7th Cir. 2011) (*quoting* previous version of Fed. R. Evid. 403). Evidence is unfairly prejudicial where "its admission makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Thompson v. City of Chicago*, 472 F.3d 444, 456-57 (7th Cir. 2006). Whether evidence is "probative" is a similar question to whether it is "relevant." *Compare Black's Law Dictionary* 1323 (9th ed. 2009) (defining "probative" as "[t]ending to prove or disprove"), *with id.* at 1404 (defining "relevant" as "[l]ogically connected and tending to prove or disprove a matter in

issue."). Here, the defendants contended that evidence of Smith's heroin use would disprove the theory that Smith required (and perhaps requested) the medication in the hospital solely for pain. Just as we think evidence of Smith's drug use on December 7 was relevant to the proceedings, we also find that it had probative value.

"Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is unfair." *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011). We have previously found evidence unfairly prejudicial, for example, where it was significantly more inflammatory than other evidentiary alternatives, *see United States v. Loughry*, 660 F.3d 965, 973-74 (7th Cir. 2011) (finding that the introduction of "hard core" pornography shortly before the trial's conclusion caused unfair prejudice to a defendant who stood accused of distributing only "lascivious exhibition" pornography, when introducing the latter type would have equally served the government's purposes), or where the contested evidence conveyed a false or misleading impression to the jury, *cf. United States v. Hanna*, 630 F.3d 505, 512 (7th Cir. 2010) (finding that a defendant was not unfairly prejudiced when he was "prosecuted for exactly what the evidence depict[ed]") (internal brackets omitted).

Here, we cannot find that evidence of Smith's drug use on December 7 was *unfairly* prejudicial. Smith argues that admitting evidence of the December 7 heroin use "undoubtedly diverted the jury's attention from its

task" and "allowed the jury to decide against Smith not because his rights were violated, but because he used illegal drugs." (Appellant's Br. at 23.) However, the defense presented to the jury a substantial amount of evidence on Smith's involvement with narcotics. For example, the jury heard that Smith was arrested on December 7 with drugs in his pocket and on December 28 with drugs laid out in front of him. The jury heard that officers went to Smith's house on December 28 to inquire about Smith's association with a drug dealer. Given the other evidence of narcotics involvement and use before the jury, we do not find Smith's argument credible. Evidence of Smith's December 7 heroin use was neither significantly more inflammatory than the other drug evidence, nor did it convey a false impression. We do not think that it was an abuse of discretion for the trial court to decide that evidence of Smith's drug use was not unfairly prejudicial when other evidence linking him to narcotics had been properly admitted. (R. 130 at 47) ("[I]t's not overly prejudicial . . . when we have heard from this defendant that he has a possession with intent to distribute conviction, that he has two possession drug convictions, that he had drugs on him . . . .").

*c. General character attack*

Similarly, we cannot conclude that admitting Smith's testimony constituted a general character attack on Smith that ran afoul of Fed. R. Evid. 404. Fed. R. Evid. Rule 404(b)(1) prohibits the use of evidence of a "crime, wrong,

or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. Rule 404(b)(2) provides, however, that such evidence may be admissible for a range of other uses, including "proving motive." As we explained above, the testimony was relevant to Smith's motivation for allegedly requesting Dilaudid. The district court's prescribed use of the evidence plainly falls within the text of Fed. R. Evid. 404. We therefore cannot conclude that it was an abuse of the trial court's discretion to permit the admission of testimony on that basis.

*2. Admission did not affect the outcome of the trial*

Even if we were to accept that the trial court abused its discretion in admitting this evidence, we would only disturb the court's ruling if there was a significant chance that the error affected the outcome of the trial. *Hasham*, 200 F.3d at 1048. We do not find that to be the case here. As described above, the defense introduced a substantial amount of evidence about Smith's involvement with narcotics to the jury. We have already held that evidence of Smith's December 7 heroin use had some probative value and caused no unfair prejudice to him. We similarly find it unlikely, in light of the other drug-related evidence admitted, that there was a "significant chance" that the contested evidence alone changed the outcome of the trial. *Cf. United States v. Jackson*, 540 F.3d 578, 593 (7th Cir. 2008) (finding error

harmless where a district court excluded statements that could have illustrated defendants' knowledge or intent when other evidence tended to show the same thing).

Our analysis is not complete, however. We must also consider the general strength of the government's case. *McKibbins*, 656 F.3d at 713. Here, there was significant evidence presented that contradicted Smith's version of events. Dr. Wallace testified that she did not observe other injuries on Smith in the emergency room, which calls into question his claims of excessive force. (R. 127 at 103-05.) Dr. Vender, the defense expert, further testified that Smith's injury could not have been caused through the mechanism Smith described. (R. 127 at 15-26.) ("[Mr. Nathan, defense counsel] Q. [I]f in a stomping motion, two or three times, is it physically, scientifically, or medically possible to get hyperextension, movement back, or lateral deviation, side to side? [Dr. Vender] A. No . . . . Q. And what was your opinion about the mechanism of the injury? A. [I]t didn't happen according to the way it was described in the deposition by Mr. Smith, the stomping.") The defense also presented significant evidence that any delay in providing Smith with medical care was not unreasonable. (R. 127 at 98) (normal wait time at the hospital was in the in the 3-6 hour range, and Dr. Wallace saw Smith within an hour of arrival.) Finally, there was competent testimony from Dr. Vender that Smith's finger was medically dead prior to December 28, such that the officers' actions that day could not have been responsible for any pain or its ultimate amputation. (R. 127 at 31) ("[Mr. Nathan]

Q. [D]o you have an opinion with regard to what point in time Mr. Smith's left ring finger was no longer viable or needed to be taken off or amputated? [Dr. Vender] A. Sometime before December 22, 2007."). Given the extent of this evidence, we find that there was a low probability, and certainly below the necessary "significant chance," that Smith's testimony about his heroin use on December 7 changed the outcome of the trial. As such, any error in its admission cannot be the basis for reversal.

*B. Closing Argument*

The defendants' attorney clearly made an improper statement in his closing argument. Despite the court's instruction that the December 7 heroin use was only relevant to the damages calculation, defense counsel attempted to tie the heroin use to Smith's actions during the arrest: "Why—why didn't he complain? . . . Is it because he took heroin earlier that day?" (R. 132 at 145.) "Improper remarks during a closing argument warrant reversal of the judgment only if the remarks influenced the jury in such a way that substantial prejudice resulted to the opposing party." *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644 (7th Cir. 1995) (internal quotation marks omitted). Reversible error occurs only if the statement was "plainly unwarranted and clearly injurious." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 730 (7th Cir. 1999).

We cannot conclude that the remarks, improper though they may have been, substantially prejudiced Smith

such that the jury's verdict should be overturned and a new trial ordered. This court has been loathe to find that improper comments made during closing argument rise to the level of reversible error. *See, e.g., Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 388 (7th Cir. 2011) ("We have stated repeatedly that improper comments during closing argument rarely amount to reversible error."); *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997); *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995).

The lone case that Smith cites to support his argument illustrates the high level of impropriety and prejudice necessary for improper statements during a closing argument to merit a new trial. In *Gruca v. Alpha Therapeutic Corp.*, an attorney for a pharmaceutical company defendant improperly and falsely stated during his surrebuttal that the plaintiffs could have sued the U.S. Food and Drug Administration rather than the defendant. 51 F.3d at 645. The district court overruled the plaintiffs' objections and "compounded its error by instructing the jury that 'government entities are sued all the time.'" *Id.* In essence, the improper statements "became a statement of the district court." *Id.* Moreover, because these "statements were made during surrebuttal argument, the plaintiffs had no opportunity to reply." *Id.* at 645-46.

Nothing of the sort occurred in this case. The district court immediately sustained Smith's objection, issued a curative instruction, and even offered a *further* curative instruction that Smith declined. The court did not adopt the statement or compound the error. There is a

longstanding presumption that "curative instructions to the jury mitigate harm that may otherwise result from improper comments" during closing argument. *Schandelmeier-Bartels*, 634 F.3d at 388; *see also Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008) ("We presume that juries follow the instructions given them by the court."); *3M v. Pribyl*, 259 F.3d 587, 600 (7th Cir. 2001) ("[A]bsent evidence to the contrary, we assume that juries follow a court's instructions."); *Jones*, 188 F.3d at 732 ("We have repeatedly found that jury instructions of this sort [reminding the jury to base its verdict on admitted evidence rather than counsels' statements] mitigate any prejudicial effect of potentially improper remarks made by counsel . . . ."). As proof that the jury could not follow the instructions given, Smith offers nothing other than the fact that it decided against him. We do not think that is enough. On these facts, we cannot conclude that the improper statements caused such substantial prejudice to Smith that a new trial is warranted.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

WOOD, *Circuit Judge,* concurring in the judgment. Somehow, in the late hours of December 7, 2007, Gregory Smith's finger was seriously injured as he was being arrested by Chicago Police Officers JaLance Hunt and Jose Cortes. The injury was obvious enough to the officers that they transported Smith to Holy Cross Hospital after booking him. There he was treated for a dislocated finger—an injury that appears clearly on x-rays that were taken at the hospital. Unfortunately, the treatment was not successful. By December 22, two weeks later, the finger was necrotic; after another week had passed and Smith was arrested again, the police returned him to the hospital and the doctors realized that the finger had to be amputated. It was. Smith then sued the officers under 42 U.S.C. § 1983, asserting that they had used excessive force in both arrests. After a trial, a jury ruled in favor of the defendant officers.

Before this court, Smith's principal argument is that the district court erred in admitting evidence showing that he had used heroin at some point earlier in the day on December 7. My colleagues believe that the district court did not abuse its discretion in permitting this evidence to be admitted for the purpose of showing what damages Smith suffered. With respect, I cannot join them in this assessment. I thus do not find it necessary or appropriate to analyze the admission of the contested evidence under Federal Rules of Evidence 403 or 404(b). Nevertheless, I agree with the majority that the admission of the heroin-use evidence was harmless error, and on that basis alone, I concur in the judgment of affirmance.

The evidence in question came from a pre-trial deposition in which Smith admitted to using heroin five or six hours before his arrest on December 7. He provided no additional details about that event or about his heroin use in general. The district court first ruled that the evidence could come in, then that it had to stay out, and finally that it could be admitted for the limited purpose of proving damages. In so doing, it rejected both Smith's general relevance objection and his argument that the evidence, if admitted, had to be accompanied by expert testimony. Smith is right on both points. Standing alone, the evidence was meaningless. Even for the issue of damages, it supported nothing but speculation on the jury's part. With an expert and with the addition of critical facts, these flaws might have been cured, but that never happened.

It is impossible in the abstract to have any idea what effect Smith's use of heroin earlier in the day might have had. The possibilities range from zero to significant, but we have no way of selecting a point on that spectrum. The effect of heroin on the human body varies according to a number of variables, including (but probably not limited to) (1) the amount taken, (2) the purity of the substance ingested, (3) the method of administration, (4) user tolerance (because addicts typically need a greater dose to achieve the same result), and (5) time since the dose. See generally NYUSteinhardt, Center for Health, Identity, Behavior & Prevention Studies, Department of Applied Psychology, Substances—Heroin, available at http://steinhardt.nyu.edu/appsych/chibps/heroin (last visited Feb. 4, 2013); The Gateway Foundation for

Alcohol & Drug Treatment, The Facts About Heroin, available at http://recovergateway.org/heroin-abuse/ heroin-facts/ (last visited Feb. 4, 2013) ("Because the strength of heroin varies and its impact is more unpredictable when used with alcohol or other drugs, the user never knows what might happen with the next dose."); BBC Health, Heroin, available at http://www.bbc.co.uk/health/ emotional_health/addictions/heroin.shtml#effects_of_ heroin (last visited Feb. 4, 2013) ("The effects vary depending on how the heroin is taken."). The record reveals nothing about any of these essential facts. If Smith had taken a small dose and his body was inured to heroin from habitual use, the effects might have worn off entirely by the time of his arrest at 11:25 p.m. If the dose had been large, the purity high, and Smith's user tolerance low, then he might have still been experiencing some effects. The period during which a dosage is effective, however, appears to be closer to three hours, not five or six. *Id.* When the district court first excluded the heroin use, it recognized that this foundation was needed to make the evidence relevant: "we don't know how much he took, and no one's here who's going to testify . . . how quickly the [drugs] assimilate into his body, how quickly would he recall, how quickly would he be clear headed . . . how long would the drug, if at all, numb his pain . . . . [T]hose are all questions that without an expert on [the defense's] side to say, it's speculation."

In my opinion, therefore, in the absence of expert testimony tending to show that there was *any* remaining physiological effect from the heroin Smith had ingested earlier in the day, this evidence had no relevance at all,

even to the damages question. The only other theory on which my colleagues rely is the notion that Smith, a heroin user, would be more likely to know that the pain-killer Dilaudid is an opiate, see http://www.drugs.com/ dilaudid.html (last visited Feb. 4, 2013). Nothing in the record tells us that Smith knew this, even if we credit the testimony indicating that he asked for Dilaudid by name. There is no evidence that his heroin supplier was pushing illicit Dilaudid pills, rather than getting heroin the usual way through criminal channels. Many people know the names of common drugs without being aware of the precise composition of those drugs or their generic names. This also rules out any use of the request for Dilaudid to show that Smith was just looking for another fix, rather than seeking something to alleviate the intense pain of a dislocated finger—pain he described as a 10 out of 10. (The practice of measuring pain on a scale of 0 to 10, with 0 being no pain and 10 being the worse imaginable, is widely used by physicians. See WebMD, Living with Chronic Pain, R. Morgan Griffin, Using the Pain Scale: How to Talk About Pain, available at http://www.webmd.com/pain-management/ chronic-pain-11/pain-scale (last visited Feb. 4, 2013) (commenting that pain scales "have a lot of good research behind them); TIPNA (The International Pudendal Neuropathy Association) website, Jack Harich, The Comparative Pain Scale, available at http://www.tipna.org/ info/documents/ComparativePainScale.htm (last visited Feb. 4, 2013).) Because we do not know how much heroin Smith ingested, and whether the effects had worn off by the time Smith was hospitalized, we can only

speculate that he might have been craving another fix less than 12 hours after ingesting the last dose. While some sources indicate that frequent users may crave heroin "fixes" several times a day, BBC Health, Heroin, *supra,* others explain that heroin users typically begin to experience withdrawal and severe cravings 48 to 72 hours after their last dose, and no one argues that Smith was anywhere close to that point. See NYUSteinhardt, Substances—Heroin, *supra;* Gateway Foundation for Alcohol & Drug Treatment, Risks of Using Heroin, available at http://recovergateway.org/heroin-abuse/ heroin-risks/ (last visited Feb. 4, 2013). Even the district court acknowledged at one point that without knowing how much heroin Smith ingested or having expert testimony on how heroin would have affected Smith, the jury would have no basis for inferring that the heroin altered Smith's conduct or ability to perceive pain at the time of the incident. As I have already said, nothing but unfounded speculation existed to answer such important questions as whether the unknown quantity of heroin had worn off, whether Smith was already craving another fix, whether Smith knew that Dilaudid is an opiate, and the degree to which Dilaudid has effects that satisfy a craving for heroin. In short, I cannot accept this alternative theory either.

Like the majority, I conclude that the prosecutor's improper statement in the closing argument did not prejudice Smith so seriously as to require a new trial. The district court intervened promptly and appropriately, and Smith gives us no reason to think that the jury did not heed those instructions.

   Trials are seldom perfect, and this one was no exception. But Federal Rule of Civil Procedure 61 does not demand perfection. To the contrary, it provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial." Justice does not require otherwise here, in my view, despite the fact that I regard the admission of the evidence about Smith's heroin use earlier in the day of his arrest as an error. For these reasons, I concur in the judgment.