In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 23-3060 & 24-1696

ANDREA NIELSEN,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

TODD SEXTON, et al.,

*Defendants-Appellants/*
*Cross-Appellees.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
No. 3:18-cv-03191-SEM-KLM — **Sue E. Myerscough**, *Judge.*

_____

ARGUED SEPTEMBER 11, 2025 — DECIDED FEBRUARY 26, 2026

_____

Before EASTERBROOK, HAMILTON, and MALDONADO,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* When defendant Richard
MacLeod was a counselor at Logan Correctional Center, an
Illinois women's prison, he repeatedly sexually assaulted an
inmate in his custody, plaintiff Andrea Nielsen. Prison
investigator Todd Sexton and Warden Margaret Burke

eventually learned of the assaults by a report from Nielsen's cellmate. Instead of protecting Nielsen from further assaults, Sexton and Burke formulated an outrageous plan to use her as unwitting "bait" to try to catch MacLeod in the act. The plan was for Sexton to stay late a few times, crawl around in the ceiling above the room MacLeod used to sexually assault Nielsen, and wait to jump down and intervene. The plan failed, and MacLeod assaulted her again.

Nielsen sued MacLeod, Sexton, and Burke under 42 U.S.C. § 1983 for violating her Eighth Amendment right to freedom from cruel and unusual punishment—MacLeod by assaulting her, and Sexton and Burke for failing to protect her from MacLeod. The jury found that all three defendants were liable and awarded Nielsen a total of $19.3 million in compensatory and punitive damages.

MacLeod did not defend himself. He was defaulted and has not appealed. Sexton and Burke defended the case, and they raise several issues on appeal. On appeal, however, they do not argue that Nielsen actually consented to any sex with MacLeod, a concession that takes one potential defense theory off the table. We affirm the district court's denial of their renewed motion for judgment as a matter of law attacking the sufficiency of the evidence that they acted with deliberate indifference after receiving a credible report that MacLeod was sexually assaulting Nielsen. We also affirm the denial of qualified immunity because no reasonable official could have thought it proper to act as they did. We also affirm in part the denial of their Rule 59 motion for a new trial on the basis of erroneously excluded relevant evidence because that error was harmless as to liability.

We must, however, reverse in part on three grounds and order a new trial on compensatory and punitive damages, but not liability, against Sexton and Burke. First, the jury lacked sufficient evidence to find Sexton and Burke liable for actions taken before learning that MacLeod was sexually abusing Nielsen. Second, the erroneous exclusion of evidence was not harmless as to punitive damages. Third, the district court erred by refusing to require the jury to determine by special interrogatory when Sexton and Burke acted with deliberate indifference. The timing is critical for assessing damages against Sexton and Burke under Nielsen's two theories of the case. We also vacate and remand the attorney fee award for reconsideration in light of the outcome of the new damages trial.

I.  *Factual and Procedural Background*

To the extent Sexton and Burke appeal the denial of judgment as a matter of law, we relate the facts in the light most favorable to the jury's verdict. *Matthews v. Wisconsin Energy Corp.*, 642 F.3d 565, 567 (7th Cir. 2011). Facts are based on the evidence admitted at trial except where otherwise noted.

A.  *Logan's Toxic Culture*

In Nielsen's words, "sexual abuse ran rampant" at Logan Correctional Center. The data agree with her. Reported rates of sexual abuse at Logan were the highest in the state among women's prisons and the second highest among all Illinois prisons. Several staff members, not just MacLeod, were caught sexually abusing inmates around the time of the events of this case. Some were fired, criminally charged, or both.

Yet according to Nielsen, "nothing was ever done" about it. A third-party investigation in early 2016 agreed. The investigators reported:

> During the assessment, some staff expressed contempt for the women and gender-responsive, evidence-based, and trauma-informed approaches by stating that they believe the women are worthless, crazy, talk too much, and will never be anything more than a convict. In some instances, they refer to the women inmates as "animals".

These beliefs contributed to prison staff not taking reports of sexual abuse seriously. One of Nielsen's expert witnesses said the report made it apparent that the prevailing attitude among staff was that "prisoners lie … if their mouth is moving."

B. *MacLeod's Sexual Abuse of Nielsen*

MacLeod, a staff member in Logan's Women and Family Services Department, became Nielsen's counselor in August 2016. That meant MacLeod was responsible for facilitating Nielsen's phone calls with her six-year-old daughter, a lifeline to the outside world for which she had spent months securing a court order and which meant "everything" to her. Because Nielsen wanted to strengthen her connection with her daughter, she jumped at the opportunity to take a "Healthy Relationships" class taught by MacLeod. When Nielsen tried to sign up, MacLeod made her come, alone, to his office in the prison's vocational building—a known "blind spot" at Logan without security cameras—supposedly for a pre-enrollment screening. There, he started talking about his own romantic

relationships and then kissed her, which made her feel "shocked" and "confused," and then asked her if she would tell anyone what he did. "Scared," "nervous," and aware that MacLeod had "power over" her such that she did not "really have a choice," she said she would not tell.

MacLeod next summoned Nielsen to his office a few weeks later, at which point he sexually assaulted her. That began a months-long pattern of sexual abuse in which MacLeod would summon Nielsen to his office for her phone calls with her daughter and subject her to vaginal and oral sex. When Nielsen "begged" him to wear a condom, he refused.

In Illinois and every other state, prison staff commit a crime by having sex with an inmate, regardless of whether the inmate supposedly consents. 720 Ill. Comp. Stat. 5/11-9.2(a) & (d) (2025); *Walton v. Nehls*, 135 F.4th 1070, 1075, 1079 (7th Cir. 2025) (collecting statutes).

To coerce Nielsen into not reporting him, MacLeod threatened her with "a year across the board." That would have meant a year of segregation—a solitary cell the inmate rarely leaves, certainly not for phone calls, and with no family pictures or personal letters—and then a year back in a regular cell but with no programming or work, no commissary privileges, and still no phone calls. MacLeod also told Nielsen that Sexton was his friend and would "protect him and let him know if anybody was on his trail." Nielsen was asked at trial whether she felt she "could or should" report the assaults. She said: "There was no doubt in my mind that I couldn't."

The sexual abuse finally ended when Nielsen—who was inexplicably stuck with MacLeod as her counselor even after switching housing units—convinced another counselor to let

her take her phone calls with him instead. MacLeod's last assault of Nielsen took place in February 2017.

C. *The Hicks Report*

On December 8, 2016, Nielsen's cellmate at Logan, whom we identify by only her surname Hicks, reported the sexual abuse to Sexton. According to Sexton's log of the interview, Hicks told him that Nielsen told her that for the past "couple months, maybe more," MacLeod had been having unprotected vaginal and oral sex with her when she would go to the vocational building to make her court-ordered phone calls to her daughter. Hicks said that MacLeod had refused to use condoms despite Nielsen telling him he "needed" to do so, claiming that smuggling them into the prison would be "too risky." Nielsen had gone the day before (a Wednesday) in the afternoon, Hicks said, although she did not know what occurred then. MacLeod also sometimes summoned Nielsen on Saturdays to "help[] him out," Hicks reported, although she did not know what time of day that typically occurred.

The report, which we will call the "Hicks Report," was admitted into evidence and much of it read verbatim into the trial transcript. One line was redacted and withheld from the jury—that while Nielsen and Hicks were talking in the shower about MacLeod, Nielsen started the conversation by saying "I have to get freshened up for my man." The redaction of this "freshen up" statement is the focus of much of this appeal.

D. *Sexton and Burke Use Nielsen as "Bait"*

Sexton testified at trial that he thought the Hicks Report was credible because it laid out the motive, means, and

opportunity for MacLeod to sexually abuse Nielsen. So that same day he took it to Burke, who agreed with his assessment.

Typically, a report of custodial sexual abuse at Logan would cause Sexton to separate the inmate and the staff member by reassigning one or the other to another housing unit pending an investigation. Sexton himself explained that the inmate is entitled to receive "immediate protection" even if the investigation ultimately produces no corroborating evidence.

But Sexton did not separate MacLeod and Nielsen. Why? In an offer of proof outside the presence of the jury, Sexton claimed that he concluded based on the "freshen up" comment that Nielsen was a "willing" participant in an "agreed-upon relationship" with MacLeod. Nielsen, he assumed, would tip off MacLeod if she became aware that Sexton was looking into things, and he would never get the evidence he needed for a criminal conviction. So, Sexton testified, he changed his usual tactics. The jury did not hear this testimony. The jury also did not hear excerpts from Sexton's deposition where he offered a different basis for this belief about Nielsen's supposed consent, said he in fact did not know one way or the other, and all but admitted that his supposed belief was a "rationalization" to make himself not "feel bad."

The jury did hear what Sexton did instead. He began by interviewing potential witnesses, but not Nielsen or MacLeod. Nor did he directly ask any witnesses about MacLeod, instead leaving his questions open-ended. These interviews yielded no "usable information" about MacLeod. Apparently, Sexton instead directed his questioning elsewhere; he was really looking into Hicks. Shortly after

receiving the Hicks Report, he testified, he changed his mind about Hicks' credibility because he was told she was giving information to gain a transfer to another housing unit.

Sexton finally spoke to Nielsen two weeks after the Hicks Report. In that conversation, he also did not use MacLeod's name. He asked her only if she had "any problems with any staff members or any issues you want to talk to me about." Recall that MacLeod had already warned Nielsen that Sexton would protect him and had threatened her with two years of harsh discipline if she told anything to anyone. Nielsen told Sexton that there was nothing going on.

Having failed to corroborate the Hicks Report through his interviews, Sexton turned to another strategy for gathering evidence: he formulated a plan to use Nielsen as unwitting "bait." Sexton stayed late at the vocational building on three random Wednesdays in December 2016 and January 2017, hoping to catch MacLeod in the act of attempting to sexually assault Nielsen. If that had happened, he testified, he would have jumped in to intervene. Literally. On the first occasion, he was hiding in the drop ceiling above the room. Burke approved the plan.

The plan, of course, relied on MacLeod attempting to sexually assault Nielsen again, and doing so on Sexton's schedule. Sexton and Burke knew that MacLeod had "continuing and ongoing access" to Nielsen, could "easily" assault her again, and could do so whenever he wanted, practically 24/7. Either Sexton or Burke could have acted on their own authority to prevent further assaults by separating Nielsen and MacLeod. They chose not to, apparently because it would have foiled their plan to use her as "bait." The plan

did not work, in any case. Sexton had given up the effort by February, when MacLeod sexually assaulted Nielsen again.

E. *Aftermath*

MacLeod's crimes came to light in August 2017 after another correctional officer reported to Sexton that MacLeod had been sexually harassing her for months. The officer said that at one point MacLeod told her, "I am a stalker. I will find out where you live. I may already know." That same day, Sexton spoke to Nielsen again, this time conducting a structured interview and specifically using MacLeod's name. As soon as he did so, Sexton testified, he could tell from Nielsen's body language that something had been going on. She soon told him about the abuse. Sexton had her belongings packed up and later that day drove Nielsen from Logan to another prison. A few days later, he emailed a former colleague about Nielsen: "Yeah I will have to tell you about the inmate I just took to Decatur Friday dealing with a certain counselor haha it's a good one." Sexton referred Nielsen's report for a criminal investigation that led to a referral to the county State's Attorney, but MacLeod was never charged with a crime.

Nielsen testified to the emotional harms she suffered at Logan while subjected to MacLeod's sexual abuse, including feeling "hopeless" and "helpless," "like nothing." She described her confusion over whether to report MacLeod, what would happen if she did, and her fear from lacking "any control over anything that happens to you." At the time of trial in 2023, well after her release from prison, Nielsen was still experiencing the lasting effects of MacLeod's sexual abuse, including panic attacks, nightmares, flashbacks, and trouble sleeping, all of which interfered with her ability to

work. A psychiatric expert, Dr. Ann Burgess, testified that Nielsen had suffered a "significant and serious injury" characterized by "severe" trauma.

F.  *This Civil Lawsuit*

In 2018, Nielsen filed this suit under Section 1983 against MacLeod, Sexton, Burke, and other then-unidentified defendants alleging violations of her Eighth Amendment right to freedom from cruel and unusual punishment and her First Amendment right to freedom from retaliation (regarding the transfer to Decatur). MacLeod defaulted. After discovery, Nielsen amended her complaint to name over twenty other officials as additional defendants.[1]

The district court granted summary judgment for all defendants on the First Amendment claim and granted summary judgment for the added defendants on Nielsen's Eighth Amendment claim. The court denied summary judgment on the Eighth Amendment claims against Sexton and Burke on the merits and on qualified immunity.

The district court also wrote in the order on summary judgment that any potential defense that Nielsen supposedly consented, or that Sexton and Burke believed she consented, failed as a matter of law because "prisoners cannot consent to sex with prison staff under any circumstances" given the obvious "power disparity," citing this court's decision in *J.K.J. v. Polk County*, 960 F.3d 367, 381–82 (7th Cir. 2020) (en banc).

---

[1] The district court had originally granted Nielsen's unopposed motion to proceed under the pseudonym "Jane Doe," but she used her real name in the public trial. Her attorney agreed at oral argument that we should use her real name in this appeal. See generally *Doe v. Trustees of Indiana University*, 101 F.4th 485, 491 (7th Cir. 2024).

Accordingly, the district court granted Nielsen's motion in limine to exclude any evidence of her supposed consent, especially the "freshen up" comment.

Nielsen proceeded to trial against Sexton, Burke, and MacLeod. Since MacLeod had defaulted, the case against him was on damages only. The jury heard a series of factual stipulations as to MacLeod (since he had defaulted), including, essentially, that MacLeod had sexually assaulted Nielsen in the manner she described. The district court instructed the jury that these facts were not stipulated as to Sexton and Burke. The district court denied Sexton and Burke's motion for judgment as a matter of law under Rule 50(a) at the close of Nielsen's case-in-chief and again at the close of all evidence.

To hold Sexton and Burke liable on her Eighth Amendment failure-to-protect claim, Nielsen had to show that she suffered serious harm from MacLeod's abuse and that Sexton and Burke contributed to causing that harm by acting with deliberate indifference, meaning they were aware of a substantial risk of serious harm and failed to take reasonable measures to prevent it. See *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008); Seventh Circuit Pattern Civil Jury Instructions § 7.16 (2025).

Nielsen advanced two distinct theories of deliberate indifference at trial. The first was based on Sexton and Burke's actions in "creating and failing to remedy *general conditions* conducive to staff-on-prisoner abuse" that existed well before August 2016, when MacLeod began assaulting Nielsen. Appellee's Br. at 24 (emphasis added). The second was that Sexton and Burke, after receiving the Hicks Report in December 2016, used Nielsen "as rape 'bait' rather than

removing her from harm's way." The district court denied
Sexton and Burke's motion to require the jury to determine
when they became liable (if it found liability) and the amount
of Nielsen's damages caused by Sexton and Burke's conduct
occurring after that time, which presents an issue we address
below.

The jury returned a general verdict, finding both Sexton
and Burke liable, fixing Nielsen's compensatory damages at
$8 million, and awarding her $800,000 in punitive damages
against Sexton, $500,000 in punitive damages against Burke,
and $10 million in punitive damages against MacLeod.

The district court entered judgment accordingly. Then it
denied Sexton and Burke's renewed motion for judgment as
a matter of law under Rule 50(b) or a new trial under Rule 59.
The district court later awarded Nielsen costs and over $2
million in attorney fees, around half of what she requested.
Sexton and Burke appealed the denial of their post-judgment
motions, and Nielsen cross-appealed certain downward
adjustments to the fee award. We consolidated the appeals
and later requested supplemental briefing on the effect of a
decision of another panel of this court dealing with an
indisputably consensual sexual relationship between an
inmate and a prison nurse, *Walton v. Nehls*, 135 F.4th 1070 (7th
Cir. 2025).

In Section II, we address Sexton and Burke's challenges to
the sufficiency of the evidence against them. We conclude that
the evidence supported the verdict under Nielsen's specific
theory of liability but not her general conditions theory. In
Section III, we reject Sexton and Burke's claim of qualified
immunity on the specific theory of liability. In Section IV, we
conclude that the district court erred by excluding evidence

of the "freshen up" comment, which was relevant to Sexton's state of mind. That evidence was relevant to both liability and punitive damages against Sexton and Burke, but the exclusion was prejudicial only as to punitive damages. Finally, in Part V we conclude that the district court erred by refusing to require the jury to determine by special verdict which of Nielsen's theories of liability it accepted because that question was critical for determining damages against Sexton and Burke. The bottom line is that a new trial is necessary on damages alone.

## II. *Judgment as a Matter of Law on Deliberate Indifference*

Sexton and Burke first challenge the sufficiency of the evidence that they acted unreasonably both in failing to address Logan's toxic culture and after learning through the Hicks Report of what they call in their brief a "possible relationship" between Nielsen and MacLeod. Because they moved for judgment as a matter of law under Rule 50(a) and (b) in the district court, we consider de novo whether "a reasonable jury would have 'a legally sufficient evidentiary basis to find for'" Nielsen, construing the evidence "strictly" in her favor. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016), quoting first Fed. R. Civ. P. 50(a)(1), and then *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).[2]

---

[2] We return to the excluded evidence in Part III, where we evaluate Sexton and Burke's arguments for qualified immunity. See *Danenberger v. Johnson*, 821 F.2d 361, 363 (7th Cir. 1987) (noting Rule 59(e) can be proper vehicle for considering qualified immunity).

A.  *Nielsen's Burden of Proof*

The district court instructed the jury that Nielsen needed to prove four elements to establish her Eighth Amendment failure-to-protect claim:

> 1.  There was a strong likelihood that Plaintiff would be seriously harmed as the result of an assault or assaults.
>
> 2.  The Defendant under consideration was aware that Defendant MacLeod would seriously harm a prisoner in Plaintiff's situation or strongly suspected that Plaintiff would be seriously harmed but refused to confirm whether these facts were true. You may infer this from the fact that the risk was obvious.
>
> 3.  The Defendant under consideration consciously failed to take reasonable measures to prevent the assault or assaults.
>
> In deciding this, you may consider how serious the potential harm to Plaintiff was and how difficult it would have been for the Defendant under consideration to take corrective action.
>
> 4.  Plaintiff would not have been harmed, or would have suffered less harm, if the defendant under consideration had taken reasonable measures.

This instruction was consistent with Seventh Circuit Pattern Civil Jury Instructions § 7.16 (2025), and with *Ortiz v. Jordan*, 562 U.S. 180, 190–91 (2011), and *Farmer v. Brennan*, 511 U.S. 825, 832–33, 837, 842 (1994).

The first element was essentially uncontested, given Nielsen's unrebutted testimony about her injuries. The second and third elements set forth the deliberate indifference standard. The actual knowledge element requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The adequacy of the official's response is evaluated "in light of the surrounding circumstances," particularly the official's knowledge of the threat at the time he acted or could have acted, not whether the threat actually materializes. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). The fourth element, causation, is evaluated in line with ordinary tort principles and requires both factual and proximate causation. *Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012). With these standards in mind, we turn to the evidence.

B.  *Sexton and Burke's Actual Knowledge of the Hicks Report*

We address Nielsen's specific theory of liability first. As Nielsen points out, Sexton and Burke appear to concede the actual knowledge element here. They argue in this section of their brief only that a reasonable jury could not have found that they acted unreasonably. The parties, however, characterize the *content* of this knowledge quite differently: Nielsen as Sexton and Burke knowing sexual abuse "occurred," and Sexton and Burke as their knowing of only "a possible relationship." Appellee's Br. at 25; Appellants' Br. at 28. The difference matters. The jury had a sufficient basis to find that both Sexton and Burke were actually aware of a strong likelihood that MacLeod was in fact sexually abusing Nielsen, coercing her into sex in an unmonitored location

practically any time he wished by controlling Nielsen's access to her daughter and by threatening retaliatory punishment.

###### 1. *Sexton*

The critical evidence of Sexton's actual knowledge is the Hicks Report and Sexton's own testimony about it. Sexton personally interviewed Hicks on December 8, 2016, prepared the report, and signed each page. Some of what he had written was read to the jury, including that the abuse had been going on for a "couple of months, maybe more," that it had occurred when Nielsen made her phone calls to her daughter, that MacLeod was not using condoms, and that they were engaging in vaginal and oral sex.

Sexton testified that he thought the Hicks Report was credible because "MacLeod had the means, motive, and the opportunity to [sexually] abuse" Nielsen repeatedly. Sexton further conceded he knew that MacLeod "refused" after Nielsen "begged" him to use a condom, putting Nielsen at risk of pregnancy and sexually transmitted disease. He also conceded he knew MacLeod had "continuing and ongoing access" to Nielsen and could "easily" sexually abuse her again. Sexton also conceded he knew MacLeod could sexually abuse Nielsen whenever he wanted, "day or night," practically 24/7 other than at count times. In fact, Sexton conceded that Hicks told him that MacLeod had summoned Nielsen the night before her report.

Sexton also conceded he knew that the vocational building was a "potential hot spot" for sexual abuse because of the lack of cameras and spotty staffing outside the regular hours of Monday to Friday, 7 am to 3 pm. Sexton further conceded he

knew this situation created "significant safety issues," namely, the risk of staff-on-inmate sexual abuse.

Sexton also conceded he knew MacLeod had "significant power and control" over all inmates at Logan, that is, the power to "make inmates do what he wanted" or else "face punishment." Sexton conceded as well that he knew MacLeod had particular levers to use against inmates with families, including access to programming and even for some, like Nielsen, access to their children. Finally, Sexton conceded that he knew these factors made Nielsen especially vulnerable to sexual abuse:

> Q. Can you understand how a female prisoner, someone who relied on Defendant MacLeod to call her child, would have no ability, would feel afraid to fight him off in this scenario? Do you get that?
>
> A. Yes.

This evidence was sufficient to establish that Sexton knew of at least a strong likelihood that MacLeod was coercing Nielsen into sex, not just that there was a "possible relationship."

### 2. *Burke*

Defendant Burke testified that she was "made aware that a third party had reported stuff was happening" to Nielsen. When pressed, she said she was aware of more details:

> Q. Stuff?
>
> A. Sorry, I will say *sexual assault*.

> Q. Sexual assault, that's right. It's hard to say; isn't it?
>
> A. It is, mm-hmm.

Burke also conceded that she thought there might be "validity to the allegations." In fact, Sexton testified that he read the Hicks Report out loud to Burke in its entirety and offered her his conclusions, including that the abuse "could easily happen again." Burke also conceded, like Sexton, that she knew the vocational building was a "blind spot." And she conceded she knew MacLeod could summon an inmate there without supervision by other staff members, cameras, or even documentation of the inmate's movement. Finally, Burke, like Sexton, conceded she knew that sexual abuse threatened inmates' (and everyone's) safety.

Burke's own testimony was sufficient to establish her actual knowledge, not just of a "possible relationship," but of a strong likelihood that MacLeod was coercing Nielsen into sex.

C.  *Sexton and Burke's "Bait" Plan*

The jury also had a sufficient basis to find that Sexton and Burke each acted unreasonably after receiving the Hicks Report. In particular, their plan to use Nielsen as unwitting "bait" left her vulnerable to further sexual assaults by MacLeod. It also forwent other potential avenues of gathering evidence.

1.  *Expert Testimony on Prison Rape*

The jury heard expert testimony from Dr. Brenda Smith, a law professor and member of the National Prison Rape Elimination Commission, which was created by the Prison

Rape Elimination Act of 2003 and tasked with developing "a set of standards that deal with the prevention, detection, punishment, [and] investigation of sexual victimization in custodial settings." Congress enacted a special law for prisons, Dr. Smith explained, because of the high prevalence of custodial rape and the "huge power differential between prisoners and staff," prison being "a closed environment" where staff "control everything that goes on" while an inmate "control[s] nothing." Among the purposes of the Act, Dr. Smith told the jury, was to make clear that "there is no acceptable amount of sexual victimization in custody," as "zero tolerance means zero." Dr. Smith explained that the Act and its implementing regulations apply to both state and federal facilities. See 34 U.S.C. §§ 30307(e)(2), 30309(7); 28 C.F.R. § 115.5 (2025).

The jury heard excerpts from a training document under the Act outlining steps for prison officials to take when they receive any reports of custodial sexual abuse:

> Staff shall report and respond to allegations of sexual abuse regardless of the source of the report; for example, third party.

> If observed, verbally reported, or through written report, all allegations are handled the same and taken seriously.

> One, separate; two, offer protection; three, treat area as a crime scene; four, report to the shift supervisor; and five, document.

Dr. Smith elaborated that "separate" means "separate the person from the offender" to "prevent additional harm," that "offer protection" means to assure the possible victim that she

or he is "not going to be harmed anymore," and that to "treat the area as a crime scene" means to gather evidence from the place the abuse occurred and from the victim.

Asked what exactly Sexton should have done after he took the Hicks Report, Dr. Smith answered in line with those steps, including that he should have "taken [Nielsen] out for a rape kit." Asked if she agreed that Sexton "did exactly what he was supposed to do," she answered, "I do not."[3]

---

[3] In reviewing Dr. Smith's testimony, we are not equating the Act's requirements with the constitutional standard for an Eighth Amendment failure-to-protect claim of custodial sexual abuse. Federal and state statutes, regulations, and departmental policies do not set constitutional standards, but parties in constitutional cases may present evidence on such matters, including expert testimony, where relevant to establishing standards of care (or the use of force) on matters outside the ordinary knowledge of a layperson. See Seventh Circuit Pattern Civil Jury Instructions § 7.04 (2025); *J.K.J. v. Polk County*, 960 F.3d 367, 379, 384 (7th Cir. 2020) (en banc) (custodial sexual abuse claim against municipality: affirming jury verdict and noting jury could have credited expert testimony in finding that county's "policy deficiency affirmatively deterred the reporting and detection of sexual abuse of female inmates"); *United States v. Brown*, 871 F.3d 532, 534, 536–38 (7th Cir. 2017) (criminal prosecution for excessive force in violation of Fourth Amendment: "Expert testimony … may be relevant in cases where specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue."). Other courts have endorsed similar evidence and reasoning. E.g., *Pearson v. Prison Health Service*, 850 F.3d 526, 536 (3d Cir. 2017) (Eighth Amendment medical care claim: "[M]edical expert testimony may be necessary"—not just permissible—"to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care."); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1111–12, 1115 (11th Cir. 2005) (Fourteenth Amendment claim for pretrial detainee's suicide: affirming exclusion of

Dr. Smith also testified to the unreasonableness of what Sexton and Burke did without relying on the Act's standards. First, she explained that briefly questioning Nielsen in general terms was inadequate because it was not "an investigation tactic designed to elicit information." Next, she explained that trying to catch a perpetrator in the act is not an "appropriate approach" because it "creates the conditions for the victim to be revictimized" and "sort of treats the victim as … a bad person, a malefactor." Nor, in Dr. Smith's view, was Sexton staying late "a few times" a reasonable way of implementing his plan:

> Q. And in your experience, is that an appropriate response to this kind of report?
>
> A. You know, it is a tactic, but it was not effective combined with anything else. Was there a plan? Was there any other information that you thought you were going to gain by just staying late to see what would happen?

2. *Sexton and Burke's Testimony*

Sexton and Burke each testified to several factors the jury was entitled to consider in evaluating the reasonableness of their actions. We review that testimony here.

Sexton conceded that after a report of custodial rape, the reported victim and offender typically would be separated

---

expert testimony partly because expert failed to testify to "any generally accepted standard of care for dealing with suicidal inmates"); *Kopf v. Skyrm*, 993 F.2d 374, 378–79 (4th Cir. 1993) (Fourth Amendment excessive force claim: reversing jury verdict for defendants because district court erroneously excluded expert testimony on proper use of police canines and "slapjacks").

because the victim is entitled to "immediate protection" even in a "he-said, she-said" situation. This did not happen for Nielsen. Sexton conceded he had the authority to move Nielsen away from MacLeod to another housing unit "immediately." Burke also conceded that she could have prevented further unsupervised meetings between MacLeod and Nielsen without needing "any further resources" but did not do so. In other words, Sexton and Burke each had the power to protect Nielsen. They both chose not to.

Sexton conceded that his December 2016 interview of Nielsen, which took place (he estimated) two weeks after the Hicks Report, consisted of only "broad questions" asking if she had "problems with any staff members." Sexton conceded that when he finally conducted the type of interview contemplated by the Act and Dr. Smith's testimony, with more pointed questions, Nielsen told him about MacLeod.

Sexton conceded that instead of separating Nielsen from MacLeod and conducting a controlled interview of Nielsen, he developed a plan to catch MacLeod in the act of sexually abusing her, using Nielsen as unwitting "bait." Originally the plan was to "crawl around in the ceiling and see if [he] could peek through the vents to catch [MacLeod] in the act," though he quickly switched to other methods, namely standing outside the office and watching through the windows. Sexton claimed that if the plan had worked, he would have intervened before the sexual assault could occur. He estimated he did three of these "stakeouts." Sexton then offered a defense of his tactics:

> Q. … One of your three unsuccessful, completely undocumented, ludicrous attempts to catch a sexual predator in the act of calling a

helpless person he had control over to him at night, and your plan was to jump out of the bushes and stop him from committing another rape of my client? I'm just trying to understand what's happening here.

A. I'm trying to build a criminal case against a staff member.

Sexton testified that Burke approved the plan. Burke conceded the same. She testified that she "did my best" but also implied she would have done things differently if given another chance:

Q. Leaving Ms. Nielsen such that she could be commanded to visit Defendant MacLeod at any time between December of 2016 and August of 2017, was doing their best to protect her?

A. Hindsight is 20/20.

3. *Analysis*

Sexton and Burke argue that because Sexton "did not ignore the risk of harm to [Nielsen], but instead sought to substantiate Hicks's allegations," no reasonable jury could find that he acted with deliberate indifference. We assume the argument extends to Burke as well, since she ratified Sexton's plan. They cite our case law to the effect that "[m]ere negligence or even gross negligence does not constitute deliberate indifference," and that "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." See *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996); *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

Where a prison official has actual knowledge of a substantial risk of serious harm to an inmate, the plaintiff must prove the official "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; accord, e.g., *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) ("measures reasonably calculated to address the risk"); *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) ("adequate response to the threat"). On a Rule 50 motion for judgment as a matter of law, the issue is whether a reasonable jury could find that the defendants' actions were unreasonable.

This inquiry should avoid the distortions of hindsight and must give "due regard for prison officials' 'unenviable task of keeping dangerous men'"—and dangerous women, and non-dangerous men and women, and in juvenile prisons, children—"'in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 844–45, quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.); see also *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions."). Nielsen did not "have a constitutional right to 'the most intelligent, progressive, humane, or efficacious prison administration.'" *Hunter*, 73 F.4th at 567, quoting *Anderson v. Romero*, 72 F.3d 518, 524 (7th Cir. 1995).

Nielsen did, however, have the right not to be used unwittingly as bait for a sexual predator. A reasonable jury could have concluded that Sexton and Burke acted unreasonably in three ways based on what they failed to do:

> (1) Failed to move Nielsen to another housing unit in line with standard protocol, thereby allowing MacLeod to continue summoning her

to a private, unmonitored location to assault her whenever he wished.

(2) Failed to interview Nielsen in a timely and structured manner designed to elicit useful information to substantiate or refute the allegation, instead waiting a full two weeks after the Hicks Report to speak with her and even then asking her only in general terms if she had anything to report.

(3) Failed to order immediately a rape kit on Nielsen and to treat the vocational building as a crime scene, leading to the loss of potential evidence against MacLeod, which Sexton claimed he needed to gather.

In addition to the evidence of these failings, a reasonable jury could have concluded that what Sexton and Burke actually did was unreasonable. Staying late on three random Wednesdays and hiding in the ceiling to catch MacLeod in the act was both unlikely to work and likely to revictimize Nielsen if it did.

Sexton and Burke's argument to the contrary is that the investigatory steps Sexton took show they did not ignore the risk of harm to Nielsen but instead tried to substantiate Hicks' allegations. But Nielsen did not need to show that Sexton and Burke completely ignored the risk to her. The Eighth Amendment standard requires not merely some response, but a reasonable one. For example, we have held that a jury could find a prison official acted unreasonably in telling an inmate that he could obtain a new cell assignment to get away from a threatening cellmate by committing a disciplinary

infraction with a punishment of thirty days of segregation. *Gevas*, 798 F.3d at 478–79, 482–83 (reversing judgment as a matter of law for defendants). Nor is standing back from an ongoing assault and telling a detainee to "learn how to fight harder or don't come to jail" a reasonable course of action. See *Grieveson v. Anderson*, 538 F.3d 763, 778–79 (7th Cir. 2008) (reversing summary judgment for defendants). Likewise for investigating and substantiating a transgender inmate's repeated complaints of rape and sexual harassment by staff and fellow inmates without taking any steps to prevent future attacks. See *Tay v. Dennison*, 457 F. Supp. 3d 657, 671–72, 685–87 (S.D. Ill. 2020) (granting preliminary injunction). We reject Sexton and Burke's sufficiency challenges as to Nielsen's specific theory of liability.

D. *Nielsen's General Conditions Theory of Liability*

By contrast, we sustain Sexton and Burke's sufficiency challenge as to Nielsen's general conditions theory of liability. Sexton and Burke each conceded they had actual knowledge of Logan's toxic culture. Sexton admitted to knowing that "sexual misconduct was rampant" and that multiple staff members had been "charged or convicted or fired or resigned" after sexually abusing inmates. Burke, for her part, admitted to knowing that Logan had a "major cultural problem," with reports of staff-on-inmate abuse "increasing." We assume without deciding that these concessions are enough to establish Sexton and Burke's actual knowledge of a substantial risk of serious harm to Nielsen and many other inmates at Logan. However, Nielsen did not offer sufficient evidence for a jury to find that Sexton took unreasonable actions that caused her injuries between August and

December 2016 or that Burke acted unreasonably during that time.

### 1. *Sexton*

To show Sexton acted unreasonably, Nielsen points to his concessions that "[n]obody was doing anything about the toxic, sexually-charged, and disgusting culture at Logan, including [him]," that he was "part of the toxic culture," that he did not always follow the Prison Rape Elimination Act to the letter even before the Hicks Report, and that it was his standard practice never to substantiate "he-said, she-said" allegations without further evidence. Assuming (without deciding) that these statements are enough to establish Sexton acted unreasonably, Nielsen still did not establish causation, which is an essential element of her claim. *Whitlock*, 682 F.3d at 582–83; Seventh Circuit Pattern Civil Jury Instructions § 7.16 (2025).

The closest Nielsen comes is testimony from another inmate at Logan, referred to at trial as Jane Doe No. 1, that MacLeod also sexually abused her and two others much as he later abused Nielsen. But Jane Doe No. 1 never reported MacLeod to Sexton, and Nielsen identifies no other basis for Sexton to have zeroed in on MacLeod before December 2016. So even if Sexton had challenged Logan's toxic culture or adequately investigated other staff members, concluding that these steps would have caused MacLeod not to abuse Nielsen between August and December 2016 would call for conjecture. See *Lapre v. City of Chicago*, 911 F.3d 424, 435 (7th Cir. 2018) (affirming summary judgment for defendant in jail suicide case in part because plaintiff "has presented little more than speculation in support of causation").

2. *Burke*

To show Burke acted unreasonably, Nielsen points to her concessions that she failed to remedy Logan's blind spots, including the vocational building, despite having the resources necessary to do so, and that she allowed counselors to meet with inmates one-on-one.

The second contention is easily dismissed. We decline to hold that failing to prohibit any and all one-on-one meetings between adult inmates and staff members about whom the warden has no particular reason to harbor suspicions is so unreasonable as to violate the Eighth Amendment. Such policies may be sensible in some contexts, but the Eighth Amendment "does not require the most intelligent, progressive, humane, or efficacious prison administration." *Anderson*, 72 F.3d at 524; see also *McKenzie v. U.S. Tennis Ass'n*, No. 22-cv-615, 2024 WL 3849884, at *6 (M.D. Fla. Aug. 16, 2024) (noting "rule of three" prohibiting one-on-one coaching in a private setting in youth sports).

Burke's failure to remedy Logan's blind spots is a closer call. Early in her tenure as warden, Burke and her subordinates mapped out the prison's existing cameras and locations where additional cameras would be appropriate, and she requested and received funding for the project. After the cameras arrived, she met weekly with the prison's chief engineer for status updates on ongoing facilities and maintenance projects, including camera installation. But "every week" the engineer "would have an explanation" for why no progress had been made on the camera project, primarily that his electrician was working on something else. Logan had no other electricians available, and Burke could not install them herself, so the project stalled. As it turned out,

the electrician was intentionally slow-walking the camera project because he, too, was taking advantage of Logan's blind spots to sexually abuse inmates.[4]

During trial, jurors asked several questions about the camera project and the electrician. They specifically asked Burke if she kept "requesting cameras be installed after [the] first initial delay." She testified that she had. True, Burke conceded immediately after that exchange that it was "my job to ensure those things were done" to protect inmates, and that on her watch as warden, "those cameras never went up."

Still, we cannot judge the reasonableness of her efforts solely by the fact that they were ultimately unsuccessful. *Dale*, 548 F.3d at 569. Burke identified the problem, secured resources to remedy it, and periodically followed up with her subordinates about it. The subordinate responsible made sure installation did not happen so he could further his own criminal purposes. Even as warden, Burke may be held liable under Section 1983 only for her own actions, not those of others. See *Hunter*, 73 F.4th at 566–67 (concluding that correctional officer acted reasonably in helping inmate fill out complaints since he did not know his supervisor would ignore them). Nielsen did not introduce evidence from which a reasonable jury could have concluded that Burke herself acted unreasonably with respect to the camera project. Thus,

---

[4] He was discovered, fired, and criminally prosecuted after concerns about the delay prompted an investigation. The trial record is sparse on details about the timing of these events, but Sexton testified that the electrician was "involved in installing cameras" for the "entire time" Sexton worked at Logan. The electrician was not charged until well after December 2016.

a reasonable jury could not have found that either Sexton or
Burke was liable under Nielsen's general conditions theory.

III. *Denial of Qualified Immunity*

We next address Sexton and Burke's argument that they
are entitled to qualified immunity as a matter of law on
Nielsen's specific theory of liability. We address this defense
separately from the sufficiency of the trial evidence because
their defense relies on evidence the district court excluded at
trial.[5]

The availability of a qualified immunity defense is often a
question of law that we review de novo. *Smith v. Finkley*, 10
F.4th 725, 734 (7th Cir. 2021). Even so, after a jury trial, "we
are bound by the jury's resolution of disputed factual issues."
*Frazell v. Flanigan*, 102 F.3d 877, 886 (7th Cir. 1996), abrogated
on other grounds as recognized by *McNair v. Coffey*, 279 F.3d
463, 464–65 (7th Cir. 2002). Since the Supreme Court's
decision in *Saucier v. Katz*, 533 U.S. 194, 200 (2001), abrogated

---

[5] The Supreme Court has written that when Section 1983 defendants
"continue to urge qualified immunity" even after a full trial on the merits,
"the decisive question, *ordinarily*, is whether the evidence favoring the
party seeking relief is legally sufficient to overcome the defense." *Ortiz v.
Jordan*, 562 U.S. 180, 184 (2011) (emphasis added). Because Sexton and
Burke's qualified immunity arguments rely on evidence that the district
court did not admit at trial—specifically, Sexton's offer of proof, including
the "freshen up" comment—this is the rare case where Rule 50(b) may not
be the proper vehicle for considering qualified immunity after trial. A Rule
50(b) motion "must be determined on the basis of the evidence the trial
judge admitted and the jury considered." *LNC Investments, Inc. v. First
Fidelity Bank*, 126 F. Supp. 2d 778, 785 (S.D.N.Y. 2001); see also 9B Wright
& Miller, *Federal Practice and Procedure* § 2529 (3d ed. 2025). If a defendant
seeks relief after trial based on evidence excluded from trial, Rule 59 offers
a better path.

on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), that deference does not extend to the ultimate finding of reasonableness. Rather, deference is given only to the "disputed 'foundational' or 'historical' facts that underlie" the qualified immunity determination, *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1147 (9th Cir. 1996), or in other words, "the who-what-when-where-why," *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). See *McNair*, 279 F.3d at 466 ("We assume that the jury resolved all factual disputes in the McNairs' favor. Juries are not authorized, however, to determine the substance of the Constitution.").

The who, what, when, and where of this case, outside of Sexton's and Burke's minds, are not materially disputed on appeal. Sexton and Burke no longer contend that Nielsen might actually have consented to sex with MacLeod. See Appellants' Br. at 40–42; Appellants' Supp. Br. at 6. The parties disagree primarily on the why—whether Sexton and Burke acted as they did because they *thought* Nielsen was a "willing" participant in an "agreed-upon relationship" with MacLeod—and whether that why matters. The why is a disputed foundational or historical fact, but we cannot infer what the jury found about the why because the district court barred Sexton from testifying about it.

Our decision in *Walton v. Nehls*, 135 F.4th 1070 (7th Cir. 2025), addressed wholly voluntary sex between an inmate and a prison staff member. *Walton* shows there can be cases where evidence of an inmate's genuine consent may be relevant in evaluating an official's response. After reviewing the excluded evidence, however, we conclude that the why does not matter in this case for qualified immunity purposes. Sexton and Burke's actions would have been unreasonable as

a matter of law even if they thought that Nielsen was a willing participant in MacLeod's sexual abuse.

A. *Clearly Established Duties of Prison Officials*

At all times relevant to this case, the law was clearly established that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). It was also clearly established that the use of force is not required: "An unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the 'force' exerted by the assailant is significant." *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012). And it was clearly established that the same standard applies in sexual abuse cases, whether the threat comes from other inmates or, as in this case, from prison staff. See *Farmer*, 511 U.S. at 830 (assault by another inmate); *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (case alleging failure to protect from prison guard: "[T]he pre-existing law was not in controversy.").

B. *Walton and Wholly Voluntary Sex Between Inmates and Staff*

Sexton and Burke rely on *Walton*, where we addressed an Eighth Amendment claim for custodial sexual abuse on an unusual factual record. The plaintiff in *Walton* had a "romantic and sexual relationship" with a prison nurse and "testified in his deposition that the relationship was consensual." 135 F.4th at 1071–72. In fact, the plaintiff had

"always described the relationship" in such terms. *Id.* at 1072. Though recognizing the "inherently coercive prison environment," the "inherently vulnerable position of prisoners," and that "unwanted sexual conduct, regardless of whether it involves force, is objectively harmful under the Eighth Amendment," we declined in *Walton* to adopt a "*per se* nonconsent rule." *Id.* at 1073–79. Such a rule, we said, would "run counter to" Supreme Court case law by "broadly and indeed categorically expanding Eighth Amendment liability in one fell swoop—without regard to the unique factual circumstances that could arise in future cases." *Id.* at 1075. We also declined to adopt a presumption of nonconsent because the evidence there overcame any such presumption. We concluded that "we cannot on this record say that [the defendant] knew of and was deliberately indifferent to an excessive risk that her conduct would seriously harm [plaintiff]." *Id.* at 1079. Thus, *Walton*'s holding was a narrow one: wholly voluntary sexual conduct between an inmate and staff member is not "sufficiently serious" or "objectively harmful" enough to violate the Eighth Amendment. See *id.* at 1072.[6]

---

[6] No federal court of appeals has recognized an Eighth Amendment cause of action for a wholly voluntary sexual relationship between an inmate and a staff member, though some district courts have done so. E.g., *Carrigan v. Davis*, 70 F. Supp. 2d 448, 453, 459–61 (D. Del. 1999); *Chao v. Ballista*, 806 F. Supp. 2d 358, 381–83 (D. Mass. 2011). We appear to have first raised the possibility of a consent defense to Section 1983 claims for custodial sexual abuse in *J.K.J. v. Polk County*, where we wrote of the officer who committed the custodial rapes:

> [The perpetrator's] only defense was to try somehow to persuade the jury that J.K.J. and M.J.J. consented to the sexual relations. The effort failed …. If the jury had

*Walton* did not hold, however, that a prison official charged with investigating custodial sexual abuse may act as if the relationship is wholly voluntary until proven otherwise. *Walton* did not hold that a prison official who actually draws the inference of a substantial risk of coercive sexual conduct may avoid liability because she also suspects that it might be non-coercive—in other words, when she is not sure one way or the other. In summary, *Walton* does not affect a prison official's duty to respond to a report of sexual conduct that the official recognizes contains both indicia of voluntariness and indicia of coercion.

## C. *Excluded Evidence*

Because we must consider the excluded evidence in evaluating Sexton and Burke's claim of qualified immunity, see *Fox v. Hayes*, 600 F.3d 819, 836–37 (7th Cir. 2010), we review that evidence here. Sexton and Burke repeatedly refer to (mostly unspecified) "evidence of consent." The choice of words is misplaced. They do not contend that the excluded evidence showed that Nielsen actually consented to sex with MacLeod. Rather, they focus their challenge on whether they *believed* she had consented. The theory is that this evidence "went to their subjective knowledge and would have allowed them to explain why they conducted the investigation in the way that they did." Appellants' Br. at 40–41. Accordingly, the

---

bought [his] story that J.K.J. and M.J.J. were willing participants (and, for that matter, even capable of being willing participants under the circumstances), it would have found that the women had not met their evidentiary burdens of proving that he acted with deliberate indifference to their safety and well-being.

960 F.3d 367, 376 (7th Cir. 2020) (en banc).

only evidence of Nielsen's supposed consent that could be relevant to their qualified immunity defense are facts that Sexton and Burke knew before February 2017, as well as testimony about their respective states of mind during that time. So the only additional documentary evidence we consider is the "freshen up" comment because it came to their attention in December 2016. We do not consider any documents related to any later investigation.[7]

Sexton testified in his offer of proof that he believed Nielsen was a "willing" participant in an "agreed-upon relationship" with MacLeod. Dr. Smith (the expert on preventing prison rape) testified in a counteroffer of proof about portions of Sexton's deposition testimony relevant to

---

[7] At trial, Sexton and Burke also made an offer of proof with evidence from an Illinois State Police investigation of MacLeod conducted many months later, in August 2017. An investigator interviewed Nielsen and ultimately concluded that MacLeod had committed custodial sexual misconduct. The case was forwarded to county prosecutors, but they chose not to pursue criminal charges. The defendants in this civil case wanted to offer several statements Nielsen made to the investigator that might have offered some support for an argument that Nielsen "consented" to the sex with MacLeod. Nielsen told the investigator that MacLeod did not use force and she did not physically resist him. The district court excluded that evidence because of the court's view that consent could not be a defense here. On appeal, as noted, Sexton and Burke have dropped any claim that Nielsen voluntarily consented to sex with MacLeod. Appellants' Br. at 40–42; Appellants' Supp. Br. at 6. As a result, any information that Sexton and Burke did not know at the time of the events relevant here could not have supported their theory that they honestly believed Nielsen might have consented to voluntary sex with MacLeod. The evidence from the Illinois State Police investigation therefore is not relevant to the issues on appeal.

his alleged belief. Burke did not present a separate offer of proof.

In Sexton's offer of proof, he testified that his belief about Nielsen's willingness was the reason he decided to interview other potential witnesses before he spoke with Nielsen. Sexton also testified that his supposed belief informed his approach when he eventually did talk to Nielsen. He said he did not "want to show all my cards because [Nielsen and MacLeod] could go about ways of hiding it." Sexton also testified that his alleged belief informed the level of danger he thought Nielsen faced, as "if it's an agreed-upon relationship, she's engaging in something [she] wants to do." He testified more broadly that his alleged belief informed the way he conducted his investigation as a whole.

Yet Sexton also acknowledged important facts that undermined his theory of consent. He conceded that the Hicks Report gave him enough information to conclude that "if she's relying on Mr. MacLeod to call her daughter"—as she in fact had to, and as the Hicks Report told him—that power would make her "more vulnerable" to sexual abuse.

Sexton also faced scrutiny on the reasons for and sincerity of his alleged belief. At trial, he testified at least twice that the "freshen up" comment was the sole basis on which he concluded that Nielsen "wanted it." To impeach Sexton on this point, Nielsen introduced testimony from his deposition in which he: (1) gave a different basis for his alleged belief, namely that Nielsen did not disclose the sexual abuse to him when he spoke to her in December 2016; (2) admitted he actually did not know at the time if Nielsen "wanted" sex with MacLeod or not; and (3) all but conceded that his alleged

belief was likely a "rationalization" to help himself not "feel bad":

> Q. Did you feel responsible that you were unable to protect Ms. Nielsen between December 2016 and August 2017?
>
> A. Not necessarily because I asked her. I gave her the opportunity to tell me in December of '16. And if she didn't want to tell me, then my thoughts are, this was something she wanted to take place. But she can't give consent; I get that. But I guess maybe that's my rationalization behind that.
>
> Q. Okay. Because Ms. Nielsen didn't disclose to you herself affirmatively in December of 2016, you believed maybe she wanted the sexual contact from Mr. MacLeod; is that what you're saying?
>
> A. I don't know if she did or not. I was just telling you I just -- I try not to feel bad about the continuation of the sexual misconduct.

D. *Analysis*

The question for qualified immunity is whether it was reasonable for Sexton and Burke to believe between December 2016 and February 2017 that their plan was a reasonable response to what they knew. *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015) (noting defendants' qualified immunity argument was "premised on the notion that it was reasonable for them to believe that Gevas' ability to refuse housing was a sufficient response to the danger even if, as we have concluded, it was not"); see also *Anderson v. Creighton*,

483 U.S. 635, 641 (1987) ("The relevant question … is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the federal agent's] warrantless search to be lawful ….").

In considering the offer of proof, we are not required to credit Sexton's testimony as true. There is no doubt that Sexton and Burke were aware of ample facts signaling MacLeod was coercing Nielsen into sex, as we explained above. *Walton* requires that we consider the "freshen up" comment and Sexton's explanations for his actions. The jury's verdict, however, also requires that we view the offer of proof as a whole—not just the portions favorable to Sexton and Burke—and in light of the whole record.

The excluded evidence changes nothing with respect to qualified immunity. Even if we were prepared to accept that Sexton concluded from the "freshen up" comment that Nielsen in some relevant way consented to sex with MacLeod—and we are not—qualified immunity still would not apply.

To overcome qualified immunity, Nielsen must be able to "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand"—before December 2016, when Sexton and Burke learned of the Hicks Report— "or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth*, 933 F.3d 696, 701–02 (7th Cir. 2019), quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). On the first prong, an analogous case need not be "on all fours" with our facts, but Nielsen would need to identify "some settled authority that would have shown a reasonable officer"

in Sexton and Burke's position that their actions were unconstitutional. *Id.* at 702, quoting *Howell*, 853 F.3d at 897, and citing *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015). *Farmer* and *Ortiz* may not be enough themselves because "the dispositive question is whether the violative nature of *particular conduct* is clearly established," not merely the right "as a broad general proposition." *Mullenix*, 577 U.S. at 12 (cleaned up), quoting first *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and then *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Alternatively, Nielsen could establish that Sexton and Burke's conduct was "so outrageous that no reasonable correctional officer would have believed the conduct was legal." *Leiser*, 933 F.3d at 704. We applied that exception in *Gevas*, reasoning that telling an inmate to escape a threatening cellmate by committing a disciplinary violation (refusing his cell assignment) "runs counter to the essential nature of incarceration" and is "at odds with the respective duties that existing case law imposed on prisoner and prison official." 798 F.3d at 485. The Supreme Court has applied that approach to tying a prisoner to a hitching post in the Alabama sun for hours without water or bathroom breaks, *Hope v. Pelzer*, 536 U.S. 730 (2002), and to leaving a prisoner for several days in a "shockingly unsanitary" cell covered "nearly floor to ceiling" with feces. *Taylor v. Riojas*, 592 U.S. 7 (2020).

Other circuits have also applied that approach both inside and outside prison. See *Gilmore v. Georgia Dep't of Corrections*, 144 F.4th 1246, 1263–64 (11th Cir. 2025) (en banc) (reversing qualified immunity; correctional officers subjected regular prison visitor to surprise mandatory strip search without offering option to leave premises); *Jones v. Hunt*, 410 F.3d 1221, 1224–25, 1230–31 (10th Cir. 2005) (reversing qualified

immunity; social worker threatened teenage girl with arrest and imprisonment for refusing to live with father in "direct contravention" of temporary restraining order prohibiting contact); *Tyson v. County of Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) (rejecting qualified immunity; sheriff's deputy used welfare check as pretense to force woman to "strip [to] her privates, to manually manipulate her genitals, and to remain exposed while he masturbated").

Nielsen relies on this obvious-violation approach. The Eleventh Circuit's decision in *Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015), is helpful here. It was a case with facts disturbingly similar to those we face here. In *Hill*, the court rejected a qualified immunity defense for a public school teacher's aide and assistant principal who "contrived" and "ratified," respectively, a plan to use a 14-year-old girl as "bait in a sting operation" to catch a male classmate in the act of sexual harassment. *Id.* at 955–56, 961, 979–80. The teacher's aide had pressured the girl to participate in the scheme after the boy kept badgering her for sex but never faced punishment. The teacher's aide did so because official school policy—which the court noted was "glaring[ly] inadequa[te]"—was not to substantiate allegations without a student being caught in the act, physical evidence, or a confession. *Id.* at 957–58, 978. But the "sting operation" went awry. The boy forcibly raped the girl while the teacher's aide waited outside the wrong bathroom. *Id.* at 962–63. The Eleventh Circuit wrote, in a terse understatement, that it was "not surprising the district court could not find similar case law." *Id.* at 979.

We are equally unsurprised here. Using a prison inmate as unwitting bait to catch a staff member in the act of sexually abusing her is obviously an outrageous response. No

reasonable prison official could have considered it acceptable. It is so outrageous that we would not expect to find much case law dealing with similar facts. And if that were not bad enough, Sexton carried out this plan so poorly, and then abandoned it, that he allowed at least one further sexual assault by MacLeod. He and Burke also left Nielsen vulnerable and fearful of further assaults for months. Compared to advising an inmate to protect himself by committing a disciplinary violation, as in *Gevas*, intentionally using an inmate as unwitting bait for a sexual predator "runs counter to the essential nature of incarceration" and is "at odds with" both a prison official's duty to protect inmates and an inmate's own obligations. 798 F.3d at 485.

For starters, willingly engaging in *any* sexual conduct exposes an inmate to discipline. We have allowed the Illinois Department of Corrections to punish an inmate who embraced and kissed his girlfriend and fondled her buttocks during a visit with a thirty-day prohibition on receiving visitors and an eighteen-month prohibition on receiving the girlfriend in particular, delaying the couple's plans to marry. *Martin v. Snyder*, 329 F.3d 919, 920–22 (7th Cir. 2003) (granting qualified immunity); see also 20 Ill. Admin. Code § 504 app. A, para. 107 (2025) (prohibiting "[e]ngaging in sexual intercourse, sexual conduct or gesturing, fondling or touching done to sexually arouse, intimidate or harass either or both persons"); *id.* tbl. A (punishable by six months' segregation, C grade, loss of privileges and/or sentence credit revocation). So Sexton and Burke's plan relied on Nielsen committing, or at least attempting to commit, acts for which she could have faced punishment similar to that which MacLeod threatened her with if she reported him.

Second, under this court's precedent, an inmate lacks a constitutional right to use force in self-defense, even to defend herself against a violent rape. *Rowe v. DeBruyn*, 17 F.3d 1047, 1052–53 (7th Cir. 1994); see also *Scruggs v. Jordan*, 485 F.3d 934, 937, 939 (7th Cir. 2017) (re-affirming and extending *Rowe* to defense of others). So an inmate could be subject to administrative discipline if at any point, including when she is alone with the perpetrator, she tries to fight off the attack. See 20 Ill. Admin. Code § 504 app. A, para. 102b (2025) (prohibiting "[c]ausing a person, substance, or object to come into contact with a staff member … in an offensive or provocative manner; or fighting with a weapon"). MacLeod knew the power this rule gave him. In fact, he threatened to concoct a story about Jane Doe No. 1 attacking him if she ever told anyone about the sexual abuse.

Third, we have repeatedly held that an inmate must follow oral and written orders from staff. See *Gevas*, 798 F.3d at 485, citing first *Forbes v. Trigg*, 976 F.2d 308, 313–14 (7th Cir. 1992) (to submit to urine tests), then *Redding v. Fairman*, 717 F.2d 1105, 1115–16 (7th Cir. 1983) (to accept housing assignments), and then *Smith v. Roal*, 494 F. App'x 663, 664–65 (7th Cir. 2012) (non-precedential decision) (to submit to handcuffing). At Logan, that means inmates are subject to discipline if they refuse to go wherever a staff member summons them, whether or not staff uses the official call-pass system. See 20 Ill. Admin. Code § 504 app. A, para. 307 (2025) (prohibiting "[b]eing anywhere without authorization or being absent from where required to be").

To put it all together, circuit and state law allows inmates to be disciplined for refusing to go where a staff member tells them, to be disciplined for physically resisting a staff

member's attempt to rape them, and to be disciplined for willingly engaging in any sexual activity with a staff member. The Constitution, under our decisions, thus left Nielsen subject to prison discipline, including further loss of her liberty, if she had tried to defend herself against MacLeod's sexual assaults. *Rowe*, 17 F.3d at 1052–53.[8]

Under *Rowe*, Nielsen had no lawful recourse because she was held in a state prison. No lawful recourse, that is, except protection by prison officials like Sexton and Burke charged by the State of Illinois (through its laws) and by Congress (through the Prison Rape Elimination Act) with preventing such crimes. The Constitution does not—and we have no difficulty characterizing our conclusion as obvious—allow those officials instead to choose deliberately to leave vulnerable prisoners at the mercy of abusive prison staff. Sexton and Burke did just that. They are not entitled to qualified immunity.

IV. *New Trial Based on Excluded Evidence*

Sexton and Burke next contend that they are entitled to a new trial because the district court erred by excluding Sexton's offer of proof as irrelevant to liability and compensatory and punitive damages.

---

[8] We have since recognized a statutory right to self-defense for *federal* inmates against unconstitutional uses of force by prison staff in part because a contrary holding "would prevent inmates from protecting themselves from sadistic and malicious acts," including "cases of sexual abuse," a result that "harmonize[s]" the federal criminal prohibition on assaulting prison guards with Eighth Amendment protections. *United States v. Waldman*, 835 F.3d 751, 755–56 (7th Cir. 2016); see 18 U.S.C. § 111.

"We review a district court's evidentiary ruling for abuse of discretion," *Maurer v. Speedway, LLC*, 774 F.3d 1132, 1135 (7th Cir. 2014), but an "evidentiary ruling that rests on a legal error is, by definition, an abuse of discretion." *Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791, 812 (7th Cir. 2021). "And, even in the face of error, we will not reverse a judgment entered on a jury verdict unless the erroneous ruling violated the objecting party's substantial rights," meaning "a significant chance must exist that the ruling affected the outcome of trial." *Maurer*, 774 F.3d at 1135, quoting *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013).

We consider separately the relevance and then the effects of the excluded evidence, first as to liability and then to compensatory damages and punitive damages. We conclude that the excluded evidence was relevant only as to liability and punitive damages and that the erroneous exclusion was prejudicial only as to punitive damages.

A. *The District Court's Rulings*

The district court made two key evidentiary rulings. Before trial, Nielsen moved in limine to exclude as irrelevant and unfairly prejudicial "any evidence or argument suggesting Plaintiff consented to the custodial rape and assaults she suffered." The district court granted the motion without explanation.[9]

---

[9] Nielsen also objected to admitting the "freshen up" comment on hearsay grounds, and she repeats that objection in her brief on appeal. The district court did not address the hearsay objection; we reject it. The "freshen up" comment as reported by Hicks to Sexton was not admissible to prove Nielsen consented or even that she ever said the words to Hicks. But it was admissible for a purpose other than its truth, that is, to show the information available to Sexton when he acted or failed to act. See, e.g.,

The district court explained its reasons when it denied Sexton and Burke's Rule 59 motion, which sought a new trial on the ground that the excluded evidence was relevant to both the objective and subjective elements of the Eighth Amendment standard, causation, and damages.[10]

---

*Carter v. Douma*, 796 F.3d 726, 736 (7th Cir. 2015) ("When the reasons for the police's actions are relevant, a witness can testify about what information prompted those actions."). Like many failure-to-protect cases, this case hinges on what Sexton and Burke knew and when they knew it. The relevance of their states of mind makes this unlike the ordinary criminal case, where out-of-court statements offered to explain the "course of investigation" "can easily violate [the Confrontation Clause], are easily misused, and are usually no more than minimally relevant." *Jones v. Basinger*, 635 F.3d 1030, 1046 (7th Cir. 2011) (granting habeas relief); see also *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) (vacating conviction on this basis).

[10] We do not address the objective element of Nielsen's Eighth Amendment claim or causation here. As previously noted, on appeal, Sexton and Burke rely on the excluded evidence only to show their subjective understanding of the situation at the time, not to show that Nielsen consented to sex with MacLeod.

Nielsen also argues on appeal, as she did in the district court, that the excluded evidence was also inadmissible under Rule 403. The district court, after concluding that the evidence was not relevant in any respect, also said it was unfairly prejudicial. Given the relevance of Sexton and Burke's state of mind at least as to punitive damages, we reject that basis for exclusion. A properly instructed jury would, we presume, understand the difference between what Sexton and Burke thought was happening and what was actually happening. See *Doe ex rel. G.S. v. Johnson*, 52 F.3d 1448, 1458 (7th Cir. 1995). Moreover, Nielsen was able to cross-examine Sexton on the matter and to testify herself.

B. *Relevance Under Rule 401*

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence is admissible at trial unless otherwise provided in the Federal Rules of Evidence or some other source of law. Fed. R. Evid. 402. Relevance is a "low threshold," and "even testimony that has 'only minimal relevance' satisfies Rule 401." *United States v. Harden*, 893 F.3d 434, 451 (7th Cir. 2018), quoting first *Tennard v. Dretke*, 542 U.S. 274, 285 (2004), and then *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012).

C. *Liability*

As we explained above, *Walton* teaches that if Sexton and Burke thought Nielsen was in a wholly voluntary sexual relationship, and if they did not draw the inference of a substantial risk that she was being coerced into sex, they could not be held liable. The district court explained the exclusion in its order denying their Rule 59 motion. That explanation was well-reasoned given the state of circuit law before *Walton*. In light of *Walton*, however, the district court's reasoning was legally erroneous and thus must be deemed an abuse of discretion, as *Walton* forecloses the district court's analysis that "[a]ny belief that Defendant Sexton held that [Nielsen] was consenting to the sexual encounters with MacLeod is negated by his understanding that [Nielsen] *could not* consent to Macleod."

If the jury had heard Sexton's testimony that he thought Nielsen was a "willing" participant in an "agreed-upon relationship" with MacLeod, and if it interpreted this

testimony as him saying that he believed Nielsen was in a wholly voluntary sexual relationship, and if the jury believed that claim, *Walton* means that Sexton could not be held liable. Nielsen correctly points out that Sexton's offer of proof addresses only his state of mind, not Burke's. Still, a jury could reasonably infer from her approving Sexton's plan that she concurred in his supposed belief, and Nielsen's case against Burke is based on her approval of Sexton's plan. The offer of proof was relevant to both Sexton's and Burke's liability, so that evidence should not have been excluded.

Before granting a new trial on liability, however, we must also consider whether the error was likely prejudicial or harmless. *Maurer*, 774 F.3d at 1135. Once again, the procedural posture of this case is critical here. Because we must predict how the jury would have ruled if the district court had allowed the excluded evidence, we must consider Sexton's offer of proof in its entirety, not just the portions Sexton and Burke prefer.

Our review leaves us satisfied that it is "unlikely that a juror would have been persuaded to change his vote on the basis of the excluded testimony." *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 151 (2d Cir. 2010). First, Sexton testified in the offer of proof that he knew Nielsen was a particularly "vulnerable" inmate because she relied on MacLeod for access to her daughter. He also testified outside the offer of proof that he knew that MacLeod had "refused" when Nielsen "begged" him to use a condom. Those concessions undermine any theory that Sexton thought Nielsen was in a voluntary sexual relationship with MacLeod. That alone is enough to distinguish *Walton*, where the relationship indisputably—based on that plaintiff's own

testimony—lacked "any coercive factors" aside from the fact that the plaintiff was in prison. *Walton*, 135 F.4th at 1072.

More important, Sexton's offer-of-proof testimony as to his alleged belief was impeached by his prior inconsistent testimony. As noted, Sexton at his deposition: (1) gave a different basis for his alleged belief, namely that Nielsen did not disclose the sexual abuse to him when he spoke to her in December 2016; (2) admitted he actually did not know at the time if Nielsen "wanted" the sexual abuse or not; and (3) all but conceded that his alleged belief was likely a "rationalization" to help himself not "feel bad."[11]

---

[11] Sexton and Burke tried to rebut this impeachment with an excerpt from the same deposition where Sexton, after reviewing the Hicks Report, testified as follows:

> Q. All right. And what about that document refreshed your recollection?
>
> A. I didn't realize that she had given such detailed things in that [document] when I first took that statement. What I remembered was that I thought she had said she was going to go see her boyfriend, but apparently, she gave me more information than that initial statement.

We see nothing in this statement or any other portion of Sexton's deposition available in the trial transcript to establish that Sexton testified at his deposition that Nielsen allegedly calling MacLeod her "man" (or "boyfriend" as Sexton recalled it) was the reason he thought Nielsen "wanted it." Defense counsel made that leap when asking the district court to let them cross-examine Dr. Smith on this point, but they cited no additional lines to support the inference. We are skeptical of this post-hoc characterization. Dr. Smith testified that inmates at Logan often used the term "boyfriend" to refer to male staff members without meaning to suggest a romantic relationship, and the district court thought it was

What's more, the jury would have been able to consider Sexton's prior inconsistent statement not only as impeachment but also for the truth of the matter asserted and could have done so against both Sexton and Burke. See Fed. R. Evid. 801(d)(1)(A) (declarant-witness); *United States v. Cooper*, 767 F.3d 721, 728 (7th Cir. 2014). So the jury would have weighed Sexton's testimony in the offer of proof with his prior inconsistent statement made three years closer to the events in question, and his admissions at trial about the coercive factors he knew were present, not to mention his flippant comment to a former coworker about Nielsen's situation once she told him about the abuse ("haha it's a good one"). Under these circumstances, Sexton's self-serving testimony that he believed Nielsen was in a "wanted relationship" would not have had a "significant chance" of convincing the jury that he was not actually aware of at least a significant risk that MacLeod was coercing Nielsen into sex. See *Maurer*, 774 F.3d at 1135, quoting *Smith*, 707 F.3d at 808. The district court's error in excluding this evidence was harmless as to liability.

D. *Compensatory Damages*

Sexton and Burke do not adequately explain why their alleged beliefs were relevant to the amount of compensatory damages. The excluded testimony in fact was not relevant to compensatory damages because Sexton's beliefs have no bearing on the harm Nielsen suffered.

---

"certainly ambiguous" whether the "she" referred to Nielsen or Hicks in the first place, given the surrounding testimony.

E.  *Punitive Damages*

We come to a different answer, however, as to punitive damages. The offer of proof was relevant to punitive damages against both Sexton and Burke. Rule 401 applies to evidence relevant to punitive damages in the same manner as evidence relevant to liability. See *E.E.O.C. v. Indiana Bell Telephone Co.*, 256 F.3d 516, 519 (7th Cir. 2001) (en banc).

The district court instructed the jury that it could award punitive damages against Sexton and Burke (and MacLeod) only if it found that "their conduct was malicious or in reckless disregard of Plaintiff's rights" and, if it so found, to consider the following factors in deciding how much to award:

> — the reprehensibility of Defendant's conduct;
>
> — the impact of Defendant's conduct on Plaintiff;
>
> — the relationship between Plaintiff and Defendants;
>
> — the likelihood that Defendant would repeat the conduct if an award of punitive damages is not made; and
>
> — the relationship of any award of punitive damages to the amount of actual harm the Plaintiff suffered.

The instruction was consistent with Seventh Circuit Pattern Civil Jury Instructions § 7.28 (2025).

The offer of proof was relevant in three ways. First, it was relevant to the threshold question of whether both Sexton's

and Burke's conduct was "malicious or in reckless disregard" of Nielsen's rights. As the district court instructed the jury:

> Conduct is malicious if it is accompanied by ill will or spite and was done for purpose of injuring Plaintiff. Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, the defendant simply did not care about Plaintiff's safety or rights.

See Seventh Circuit Pattern Civil Jury Instructions § 7.28 (2025). A reasonable jury might have credited Sexton's statement that he thought Nielsen was a "willing" participant in an "agreed-upon" relationship, even if we doubt it would have believed he thought there was no significant risk that Nielsen was being coerced. If so, the jury may have been less likely to infer that Sexton or Burke acted with "ill will or spite" or "did not care about [Nielsen's] safety."

Second, the offer of proof was also relevant to the amounts of punitive damages the jury awarded, most directly to the reprehensibility of both Sexton's and Burke's actions. A reasonable jury could conclude that while using as bait an inmate who the prison official thinks is a willing participant might be reprehensible enough, using an unwilling inmate was even more so. Reprehensibility was likely a major factor in the jury's punitive damages awards. After all, reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" for Due Process Clause purposes. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

The offer of proof was also relevant to the likelihood of repetition of Sexton's conduct. (By the time of trial, Sexton

had been promoted to shift supervisor at another prison. Burke had retired.) In his testimony, Sexton referred on several occasions to unstated "reasons" for the steps he took, but the district court barred him from explaining his reasons to the jury. Left to speculate on what these reasons might have been, the jury might have drawn any number of unsupported inferences that could have affected the amounts it awarded.

Given the discretionary nature of punitive damages, errors in admitting and excluding evidence bearing directly on a defendant's moral culpability cannot be treated too easily as harmless. The error here was not harmless. By way of comparison, the standard for relevant mitigating information in capital sentencing is similarly far broader than for evidence relevant to guilt or innocence. See generally *United States v. Tsarnaev*, 595 U.S. 302, 317–20 (2022); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). We vacate the jury's awards of punitive damages against Sexton and Burke. Given our holding in Section V, at the new trial on damages both sides should be able to present evidence and argument relevant to whether punitive damages should be awarded and, if so, in what amounts.

V. *Compensatory Damages Under Nielsen's Two Theories of Liability*

Finally, Sexton and Burke contend that the district court erred by refusing to instruct the jury, if it found liability, to determine in a special verdict the theory or theories of liability it accepted. As discussed above, Nielsen advanced a "general conditions" theory of liability—essentially, that Sexton and Burke contributed to creating a toxic culture of sexual abuse at Logan—as well as a more specific theory of liability based on what they did after receiving the Hicks Report. The

difference matters, Sexton and Burke argue, because the theory of liability affects the scope of damages for which they are liable: for harms they caused from August 2016 onward for the general conditions theory, and from the Hicks Report in December 2016 onward for the specific theory.

A district court may require a civil jury to answer interrogatories making "a special written finding on each issue of fact" or to answer a general verdict "together with written questions on one or more issues of fact that the jury must decide." Fed. R. Civ. P. 49(a)(1) & (b)(1). "[W]e review a district court's refusal to submit a proposed special verdict question … only for an abuse of discretion." *Bularz v. Prudential Insurance Co.*, 93 F.3d 372, 377 (7th Cir. 1996).

We conclude that this is a rare case where a special verdict was not just helpful but necessary. As Sexton and Burke explain, only if the jury accepted both theories of liability could these defendants be found deliberately indifferent for the entire period. The fundamental problem stems from the role of MacLeod at trial, even as a defaulted party, and in the jury's tasks. MacLeod was indisputably liable to Nielsen for *all* her injuries. Though far from the only aspect of compensatory damages she sought, Nielsen testified at length to the emotional harms she suffered as an inmate *while MacLeod was sexually abusing her*—i.e., from August 2016 to February 2017. We expect that the length of time or number of times a plaintiff experiences such abuse would likely affect a jury's damages award. Indeed, Nielsen's counsel referred aptly in closing argument to the "months and months and months" of abuse Nielsen suffered. We must assume the jury included in its $8 million compensatory damages award all of Nielsen's injuries from August 2016 onward, even though it

lacked sufficient evidence to conclude that Sexton and Burke were deliberately indifferent before December 2016.

Joint and several liability does not offer a path to affirm here. Sexton and Burke are jointly and severally liable for injuries they each personally contributed to causing through their joint unconstitutional conduct, but not otherwise. See *Harper v. Albert*, 400 F.3d 1052, 1061–62 (7th Cir. 2005). Sexton and Burke acted in concert, so it would not be necessary to apportion compensatory damages between the two of them. But unless the jury accepted Nielsen's general conditions theory of liability—and we have concluded that no reasonable jury could have done so—it should have been required to apportion damages between injuries caused by sexual abuse before and after the Hicks Report.

Nielsen defends the general verdict by citing Section 1983 cases in which we have said that damages should not be apportioned where several state actors contribute by their unconstitutional conduct to an "indivisible injury." These cases are readily distinguishable because each involved essentially one discrete event. None were fairly comparable to "months and months and months" of emotional distress inflicted by multiple distinct sexual assaults. See *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 297–98 (7th Cir. 2010) (death from illness after less than one week in custody); *Harper*, 400 F.3d at 1054 (abuse by several guards "during a cell-transfer procedure"); *Cooper v. Casey*, 97 F.3d 914, 916, 919 (7th Cir. 1996) (one episode of "kicking and punching and macing" by several guards followed by "refusal to provide prompt medical assistance" for two days); *Watts v. Laurent*, 774 F.2d 168, 171 (7th Cir. 1985) (single violent attack by fellow juvenile detainee). While the follow-on effects of MacLeod's

abuse of Nielsen are perhaps "indivisible," the length of time she spent in custody subject to MacLeod's abuse is not. The Hicks Report is, for damages against Sexton and Burke, the clear demarcation.[12]

Certainly, Nielsen suffered "neither purely physical nor temporary" harms. But her damages expert, Dr. Burgess, testified to six "buckets" of harm Nielsen suffered, the first being "physical assault," and Nielsen's counsel referred to that testimony again in closing argument when asking the jury to award damages of at least $2 million for that (and every other) category. Thus, Nielsen's close reading of Dr. Burgess's testimony that she suffered a "'significant and serious injury' (singular) in the form of a 'serious trauma' (singular)," as well as her parsing of similar language in *J.K.J v. Polk County*, 960 F.3d at 376, do not convince us that Sexton and Burke can be held liable for all harm Nielsen suffered. We therefore remand for a new trial on both compensatory and punitive damages, but not liability, against Sexton and Burke.[13]

To sum up: MacLeod did not appeal, so the portion of the judgment against him is not affected by this decision. We

---

[12] Moreover, given the district court's denial of Sexton and Burke's requested verdict form, we cannot fault them, as Nielsen invites us, for failing to "establish [at trial] any manner to assess that 'one trauma' on an assault-by-assault basis." See Appellee's Br. at 48.

[13] Finally, Sexton and Burke argue that the district court's multiple errors, including three supposed errors not addressed in this opinion, had the cumulative effect of depriving them of a fair trial. See *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013). We have granted a new trial on compensatory and punitive damages based on the excluded evidence and the verdict form, but we find no merit in appellants' other contentions.

affirm the jury's finding of liability against Sexton and Burke based on Nielsen's specific theory of liability and the denial of qualified immunity. We vacate the compensatory and punitive damage awards against Sexton and Burke and remand for a new trial on compensatory and punitive damages for their outrageous response to the Hicks Report. We also vacate and remand the attorney fee award for the district court's reconsideration in light of the result of the new damages trial and in accord with *Hensley v. Eckerhart*, 461 U.S. 424 (1983). See also *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407–08 (7th Cir. 1999). Finally, Circuit Rule 36 shall not apply on remand if Judge Myerscough is willing to preside over the new trial on damages.